**POTASH COMPANY OF CANADA LIMITED, Plaintiff,**

v.

**The M/V RALEIGH, her engines, boilers, tackle, apparel, etc. and Panama Salvage and Towage, S.A., Defendants.**

**Capt. William G. GAWRONSKI, Plaintiff,**

v.

**S/S RALEIGH, her engines, tackles, boilers, etc., Defendant.**

**CROWN NAVIGATION CORPORATION, a foreign corporation, Plaintiff,**

v.

**S/S RALEIGH, her engines, tackles, boilers, etc., Defendant.**

**William M. FRASER, Plaintiff,**

v.

**The MONETARY PROCEEDS FROM the SALE OF the VESSEL "S/S RALEIGH" Located Within the Registry of this Court.** (Formerly: S/S Raleigh, her engines, tackle, boilers, apparel, etc.).

**AMERICAN PACIFIC CORPORATION, Plaintiff,**

v.

**The MONETARY PROCEEDS FROM the SALE OF the VESSEL "S/S RALEIGH" Located Within the Registry of this Court (Formerly: S/S Raleigh, her engines, tackle, boilers, apparel, etc.).**

**UNITED STATES of America, Plaintiff,**

v.

**SS RALEIGH, Defendant.**

Civ. Nos. 7300, 7331, 7332, 7375, 7376 and 7548.

District Court, Canal Zone, Balboa Division.

July 25, 1973.

DeCastro & Robles, Balboa, Canal Zone, for Potash Co. of Canada, Ltd.

Albert J. Joyce, Jr., Balboa, Canal Zone, for Panama Salvage and Towage, S.A.

No timely appearance was filed on behalf of defendant, M/V Raleigh.

Henry L. Newell, Balboa, Canal Zone, for Wm. G. Gawronski.

Henry L. Newell, Balboa, Canal Zone, for Crown Navigation Corp. and others.

Michael C. Pierce, Balboa, Canal Zone, for Wm. M. Fraser.

Albert J. Joyce, Jr., and Michael C. Pierce, Balboa, Canal Zone, for American Pacific Corp.

Lester Engler, U. S. Atty., Balboa, Canal Zone, for the United States.

## MEMORANDUM OPINION

CROWE, District Judge.

These actions were brought by the various plaintiffs to establish their maritime liens against the vessel M/V RALEIGH.

The action brought by plaintiff, Potash Company of Canada, Limited, in Civil No. 7300, resulted from the failure of the M/V RALEIGH to perform its obligations under an agreement of voyage charter for the carriage of a full cargo of granular and coarse potash in bulk, from Vancouver, British Columbia to the ports of Santos and Parangua, Brazil. The cargo was loaded on the M/V RALEIGH and the vessel sailed from Vancouver on or about August 20, 1971 with 90% of the freight prepaid by plaintiff. Plaintiff alleges that it was at all times ready, willing and able to pay the defendant the remaining 10% of the freight after delivery of the cargo at the destinations as provided in the charter party.

The vessel arrived at the Port of Balboa, Canal Zone on or about September 20, 1971 and failed to continue the contract voyage to its destination at the ports in Brazil by reason of the defendant's, Panama Salvage and Towage, S. A., financial inability to get the vessel to its destination and discharge the cargo, and the voyage was abandoned at Balboa.

Plaintiff, Potash, engaged in protracted negotiations with the defendants in an attempt to have the vessel resume her voyage to Brazil with no results. The vessel remained at the Port of Balboa from on or about September 20, 1971 until she was attached by the U. S. Marshal of this court on October 14, 1971 in an action brought by many of the officers and crew members of the vessel for unpaid wages and other claims. The defendant-owner failed to have the vessel released and did not file a timely appearance and claim in the action or arrange for release of the vessel under bond in those cases nor in any of the other actions joined herein and, as a consequence, the M/V RALEIGH was sold by the U. S. Marshal on November 29, 1971 pursuant to an order entered by the Court on November 12, 1971. This was done in accordance with Rule E(9)(b) of the Supplemental Rules for Certain Admiralty and Maritime Claims, F.R.C.P.

The vessel was sold by the Marshal in civil action 7296 (an action for wages by crew members) and $95,000.00 was realized from the sale, which was deposited in the hands of the Clerk of the Court. As a consequence of the claims by the crew for repatriation, maintenance and care of the vessel and costs, the proceeds from the sale were reduced to $19,412.75 remaining in the hands of the Clerk.

Default judgment has been entered in case number 7300 in favor of the plaintiff, Potash, in the sum of $119,360.00 plus interest and costs. Default judgments were entered in case number 7375 for William F. Fraser in the sum of $8,600.00 and in case number 7376 for the American Pacific Corporation in the sum of $3,586.00. In case number 7332, filed by the Crown Navigation Corporation, there is a claim alleged in the complaint for $56,161.00. In case number 7331, with Captain Gawronski as plaintiff, there is a claim in the complaint for $19,266.15 and $3,651.98. In the first three cases, the allegations are that these sums were furnished for necessaries and supplies. In Captain Gawronski's case, number 7331, he alleges that the $19,266.15 was expended for "materials, supplies and wages for the crew", but he does not claim a maritime lien for the $3,651.98 set out in the complaint.

The United States of America in case number 7548 sets out in the complaint a claim for $4,863.00 as the amount due and owing the claimant for food, shelter and repatriation costs of eight crew

members of the vessel who deserted on or about September 1, 1971 and were repatriated to Taipei, Formosa.

The crew's wages, claims and costs and the expenses of their repatriation in all the actions in the court, with the exception of that set out by the United States of America in 7548, were paid by stipulation and agreement between the parties. These six cases were consolidated and the matter is now before this Court for the determination of priorities so as to effect a distribution of the proceeds remaining in the Registry of the Court from the sale of the vessel.

It is contended by Potash that its lien sounds in tort and that the law of Panama should be applied in determining the priorities, instead of the law of the forum, as the M/V RALEIGH was a ship of Panamanian registry sailing under the flag of Panama.

■■ The Court sustains the position argued by the plaintiff, Potash, that its lien resulting from the failure of the M/V RALEIGH to perform its obligations under an agreement of voyage charter when 90% of the freight was prepaid by plaintiff, who was willing and able to pay the remaining 10% after delivery, is a lien sounding in tort arising out of the ship's violation of her duties as a common carrier. The vessel was a general ship carrying goods for hire and was consequently a common carrier according to the charter law. Liverpool Steam Co. v. Phenix Ins., 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788.

In the case of The Henry W. Breyer, 4 Cir., 17 F.2d 423, it was said:

"The intervening libels of the shippers sound in tort, on the theory that they are entitled to recover damages for breach of the carrier's common-law duty, notwithstanding that the carrier's default was also a breach of the contract expressed in the bill of lading. The responsibilities of a common carrier may be restricted by contract, but the nature of its occupation makes it a common carrier still." The Court further stated that: "It is well established that ordinarily the owner of the goods damaged by the dereliction of a common carrier has the option to bring action either in contract or in tort."

The Breyer case is very much in point and deals with a situation where a ship which had accepted cargo was financially unable to complete the voyage. Although there was no loss or injury to the goods, there were damages to the shippers occasioned by the climbing price and loss of market. The Court stated:

"The only reason for the failure of the vessel to break ground was the financial inability of the owner. It did not have the funds to coal the ship or pay the crew, and the vessel was consequently unable to sail. Having, therefore, failed in a duty imposed by the law, the ship was guilty of tort, and the shippers were entitled to recover the prepaid freight in an action of negligence."

The Court went on to say that the complete financial inability of the owner of the vessel to comply with the obligations of a common carrier must have been known to the managers of the vessel when the cargo was taken on board and its action in accepting the goods, and particularly in receiving the freight money in advance, was in effect fraudulent.

The same reasoning is applicable in this case as the vessel, after it came to Balboa, was in such a state that the owners were completely incapable of continuing the voyage and paying the crew. Great delay ensued as the result of this financial inability and the ship was ultimately sold, as stated above.

See Phila., Wilm. and Balt. v. Lehman, 56 Md. 209; Central Trust Co. v. East Tennessee Co., D.C., 70 F. 764; Thomas v. Lancaster Mills, 71 F. 481, 19 CCA 88; also Henry Siegel Co., D.C., 223 F. 369 and Hornor v. Henning, 93 U.S. 228, 23 L.Ed. 879.

■ The Court cannot agree that the priority of liens should be determined by

the law of Panama. In the cases cited by Potash, wherein the law of the flag was used in determining the rights of the parties, the decisions had to do with the rights of seamen under contract with the ships' owners and dealt with the internal economy of the ships.

The law concerning the rank of liens, however, is upon a different theory, as was held by Judge Brown in The Scotia, D.C., 35 F. 907, 1888, as follows:

"Liens and privileges, when enforced in other countries than in those by whose laws they are created, are largely treated as remedies; and, unless affecting foreigners alone, take rank according to the law of the forum."

As cited in that case, Chief Justice Marshal said in Harrison v. Sterry and others, 5 Cranch. 289, 1809, 3 L.Ed. 104 a case in bankruptcy:

"The law of the place where a contract is made is, generally speaking, the law of the contract, i. e., it is the law by which the contract is expounded. But the right of priority forms no part of the contract itself. It is extrinsic, and is rather a personal privilege, dependent on the law of the place where the property lies, and where the court sits which is to decide the cause."

In a recent case, Brandon v. Denton, 5 Cir., 302 F.2d 404, a preferred ship mortgage was given priority over a maritime lien for fuel oil furnished the vessel in Italy as under United States law a preferred ship mortgage lien is entitled to priority over all claims against the vessel except preferred maritime liens and expenses and fees allowed and costs taxed by the court.

The Federal Ship Mortgage Act of 1920, set out in 46 U.S.C.A. § 953(a) and (b) is a statutory ranking of liens and is as follows:

"(a) When used hereinafter in this chapter, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage.

"(b) Upon the sale of any mortgaged vessel by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all preexisting claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of section 952 of this title, shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court."

The list of maritime liens generally accepted are set out in Benedict on Admiralty, Sixth Edition, Volume 1, § 11, at page 19, which says:

". . . the first named having the highest ranking when all are of equal age:

"I. *Superior to the Preferred Ship Mortgage*:

"Legal costs, Tonnage and light dues; Taxes.

"Wages of crew, but not of master; Wages of stevedores directly employed by the shipmaster, not through an independent contractor.

"Collision liability; Contribution in General Average; Liability to pay salvage; Liability for cargo loss and damage; Liability for bodily injury, and for wrongful death.

"II. *The Preferred Ship Mortgage registered in the home port.*

"III. *Subordinate to the Preferred Ship Mortgage*:

"Repair liens *in rem* as well as possessory; Master's and Owner's bill of lading; other bills of lading if ratified by sailing with cargo; Supply of necessaries; Service of Master Stevedore and his employees; Wharfage; Towage."

It appears, therefore, that the liens of the plaintiff, Potash, in case number 7300, and that part of Gawronski, in case number 7331, which was paid for crew's wages, are the highest ranking.

The liens on behalf of the other claimants, Crown Navigation Corporation, in case number 7332; William M. Fraser, in case number 7375; and American Pacific Corporation, in case number 7376, and that part of Gawronski which has to do with necessaries are in a subordinate position as they are liens for supplies and necessaries and therefore are entitled to be paid only on the satisfaction of the superior ranking liens.

The claim of the United States of America, in case number 7548, is based upon food, shelter and repatriation costs of eight crew members of the vessel who "deserted" and were repatriated to Taipei, Formosa.

By statutory provision, the penalty for desertion is set out in 46 U.S.C.A. § 701, which states that any seaman who commits such an act shall be punished as follows:

"For desertion, by forfeiture of all or any part of the clothes or effects he leaves on board and of all or any part of the wages or emoluments which he has then earned."

There is no showing on the part of the United States of America that it has any greater right to a lien for its moneys expended than the deserting crew members. As their rights have been forfeited by operation of the statute, it would appear that the plaintiff has no maritime lien and any claim it might have against the proceeds of the sale of the vessel would be subordinate to the liens claimed in the other cases in this action.

The cases therefore are retained upon the docket for a determination of what part of Gawronski was expended for wages for the crew and further orders of the Court.