RAYON Y CELANESE PERUANA, S.A.,
a corporation, Plaintiff,

v.

M/V PHGH, her engines, tackle, hull, appurtenances, equipment, etc., in rem, Defendant,

R. et G. Dekytspotter, a corporation, Francois Le Parco, a corporation, and Societe Des Avitailleurs Reunis Bordelais, a corporation, Intervenors.

Civ. A. No. 78–174–H.

United States District Court,
S. D. Alabama, S. D.

June 13, 1979.

As Amended June 29, 1979.

Patrick H. Sims and David A. Bagwell, Mobile, Ala., for plaintiff.

Rae M. Crowe and Donald C. Radcliff, Mobile, Ala., for intervenor Agence Martine & Curtis Bay Towing Co.

Alex F. Lankford, III, Mobile, Ala., for intervenor Societe Nigeria National Supply Co., Ltd., R. et G. Dekytspotter, Francois Le Parco and Societe Des Avitailleurs Reunis Bordelais, French corporations.

## MOTION FOR LEAVE TO INTERVENE

HAND, District Judge.

R. et G. Dekytspotter, Francois Le Parco, and Societe Des Avitailleurs Reunis Bordelais, French corporations, move this Honorable Court for an Order permitting them to Intervene pursuant to Rule. 24(a) of the Federal Rules of Civil Procedure, and as grounds therefor, aver that they have lien claims against the M/V PHGH (ex SOUTHERNER) for advances made to said vessel for necessaries, supplies, repairs and maintenance, as more fully set forth in their Complaint in Intervention. Said Intervenors claim maritime liens against the aforesaid vessel and, therefore, claim an interest relating to the property which is the subject of this action, and are so situated that the disposition of this action, namely the sale of said vessel at U.S. Marshal's sale and the cutting-off of all maritime liens by such sale, may as a practical matter impair or impede their abilities to protect their claims.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. *Introduction.*

This is an action properly brought within the admiralty and maritime jurisdiction of the United States against the M/V PHGH *in rem,* and the proceeds of her sale by the U.S. Marshal under process issued in this cause.

Because of the large sum of claims and the relatively small sale proceeds in the Registry, this Court on March 28, 1978 ordered that—unless objections were filed— this case would proceed on a simplified procedural basis using affidavits and, wherever possible, stipulations. No party having objected, the case is submitted upon the pleadings, affidavits, stipulations, and briefs on file.

### II. *Findings of Fact.*

#### A. *Seizure, Arrest and Sale.*

On February 2, 1978, the M/V PHGH—a cargo vessel of Panamanian registry—was seized by the USCG Cutter Acushnet on the High Seas about 200 miles out in the Gulf of Mexico for violation of U.S. laws involving the importation of marijuana. The vessel, its crew, its legitimate cargo of sulphur, and its contraband cargo of marijuana were brought by the Coast Guard to the Port of Mobile, Alabama. The Government filed no forfeiture against the vessel for four and one-half months, just two days prior to the sale of the vessel in this privately-brought admiralty case. The foreign crewmembers were prosecuted in this court, where they pleaded guilty, were sentenced to probation and deported.[1] The sole American involved was tried and convicted.[2] The sulphur car-

1. *United States v. Konstadinos Tsadilis, et al.,* Criminal No. 78–28 (U.S.Dist.Ct. for Southern District of Alabama).

2. *United States v. Williams,* 589 F.2d 210 (5th Cir. 1979) (*Petition for Rehearing and Rehearing En Banc* filed February 27, 1979).

go was adjudged in this court[3] to be owned by plaintiff herein, Rayon Y Celanese Peruana, S.A. [hereinafter "Raycel"], a Peruvian corporation not involved in the attempted importation of the drugs, and the sulphur was released. On March 31, 1978, Plaintiff Rayon Y Celanese Peruana, S.A. filed this action in admiralty against the vessel *in rem* for its damages alleged to have been suffered by virtue of the vessel's having caused the abortion of the legitimate voyage by geographic deviation and by carriage of contraband. The vessel, in Government custody but not then forfeited, was seized at the instance of Raycel on March 31, 1978. A number of private parties intervened in the case, and the vessel was sold by the U.S. Marshal on June 14, 1978 upon motion of the private plaintiffs herein. The vessel was sold at Marshal's Sale to the highest bidder for only $40,-000.00 and, after a delay to allow unloading of the legitimate cargo of sulphur, the sale was confirmed by this Court. All parties have claimed against the proceeds of sale[4] as hereafter discussed.

### B. *Claims of All Parties.*

1. *Claim of Agence Martine.* On or about December 2, 1977, and for approximately two days thereafter, in Port-au-Prince, Haiti, Agence Martine, a corporation, at the request of and by agreement with those in control of the M/V PHGH, provided advances for and paid for certain necessary supplies and other vessel necessaries and rendered services to the M/V PHGH of the reasonable value of $14,-849.85. There presently remains due and owing to Agence Martine that amount.

2. *Claim of R. et G. Dekytspotter.* R. et G. Dekytspotter on October 5, 1975, at Nantes, France, at the request of the opera-

tors of the vessel, provided advances to the M/V PHGH for necessaries, supplies, repairs and maintenance, in the sum of approximately 5,055 and 15/100 French francs which, at the current rate of exchange, is approximately $1,097.00 in United States dollars. No part of that sum has been paid to date.

3. *Claim of Francois Le Parco.* Plaintiff Francois Le Parco, a corporation organized and existing under the laws of the Republic of France, on or before May 25 through 28, 1976, at the Port of Tonnay Charente, France, at the request of the operators of the vessel, provided certain necessary advances for necessaries, supplies, repairs and maintenance of the reasonable value of 7,801 and 55/100 French francs, which in present U.S. dollars is approximately $1,693.00. No part thereof has been paid to date.

4. *Claim of Societe des Avitailleurs Reunis Bordelais.* Plaintiff Societe des Avitailleurs Reunis Bordelais on June 10–11, 1976, at the Port of Bordeaux, France, at the request of the operators of the vessel, provided certain necessary advances to the vessel for necessaries, supplies, repairs and maintenance, of the reasonable sum of 63,-753 and 20/100 French francs, which in present U.S. dollars is approximately $13,-834.00. Notwithstanding demand therefor, no part thereof has been paid to date.

5. Claim of *Societe Nigeria National Supply Co.* Plaintiff Societe Nigeria National Supply Co., Ltd., delivered aboard the vessel (then owned by different owners and named SOUTHERNER, in Dunkirk and Bordeaux, France, in June of 1976, two cargoes of cubed sugar for carriage to Lagos, Nigeria, to be carried under bill of lading. Upon discharge in Lagos on January 26, 1977, the cargo was found to be

---

**3.** *Rayon Celanese Peruana, S. A. v. United States,* Civil Action 78–254–H (Order of May 25, 1978).

**4.** Raycel brought an action in this Court against the United States upon the ground that the seizure violated the U.S. Constitution and International Law. This Court on April 5, 1979 granted summary judgment in favor of the United States. *Rayon Y Celanese Peruana, S. A. v. United States,* Civil Action No. 78–376–H (Order of April 5, 1979). The case has been appealed.

either damaged or short in the amount of $22,834.90.

6. *Claim of Curtis Bay Towing Co.* Plaintiff Curtis Bay Towing Company, a corporation incorporated pursuant to the laws of Pennsylvania, on or about November 10, 11, and 16, 1977, provided dockage and sailing services to the M/V PHGH of the reasonable value of $2,644.13 in Philadelphia, Pennsylvania. No part thereof has been paid, and the entire amount remains due and owing.

7. *Claim of the United States.* The United States has filed a claim for custodial expenses in the amount of $30,615.83, representing more than three-fourths of the proceeds of sale. Since Raycel repaid the Government for $14,560 for custodial costs during the period in which confirmation of the sale was delayed to allow Raycel to get the ship in a seaworthy condition or remove its sulphur cargo, it would be helpful to break down the Government's claim for the remainder as follows:

(a) *Storage, Maintenance and Guard Service.* The actual cost of storage and guard service was $200.80 per day. The Government claims that it is entitled to reimbursement for these costs from the time the vessel arrived in Mobile in February until the time Raycel began to pay the custodial expenses in June.

Raycel and the private plaintiffs strenuously object. They point out that the government brought the ship to port and took no overt steps toward forfeiture for a period of some four and one-half months, during which the Government was paying $200.80 per day for guards and dockage. The Government did not in fact file a forfeiture complaint until two days before the scheduled sale of the vessel, which was brought about not in a statutory forfeiture proceeding but in this private admiralty action.[5] The Government is entitled to recovery of guard and dockage expenses from

the date it became custodian in this case (March 31) until the date Raycel began to pay the costs (June 21) or, 83 days at $200.80 per day, totalling $16,666.40. The Government is *not* entitled to recover from these proceeds for guard and dockage expenses incurred prior to March 31, 1978, for the reasons discussed in the "Conclusions of Law" portion which follows.

(b) *Towing and Moving.* The government is entitled to $1,100.20 as the reasonable expense of towage and moving the vessel to its place of storage.

(c) *Waste Disposal.* The Government claims $345.96 for "waste disposal" expense, which is not further explained or substantiated. Under the circumstances, the claim is not reasonable and is denied.

(d) *Long Distance Calls and Survey.* The Government claims reimbursement for $218.30 in telephone calls and survey costs which is allowed.

(e) *Stevedoring Expense.* The Government claims $2,040.97 for stevedoring and labor expenses. The claim is not allowed, because it is not a "custodial" expense but is instead a "law enforcement" expense, representing as it does the removal of the marijuana from the ship. Private claimants herein ought not to have to bear that expense.

(f) *Summary.* The Government has proved a claim for reasonable custodial expenses in the amount of $17,984.90.

8. *Claim of Rayon Y Celanese Peruana, S.A.* (a) Plaintiff Rayon Y Celanese Peruana, S.A., a Peruvian corporation, owner of a cargo of bright slated sulfur in bulk, delivered its sulphur aboard the M/V PHGH on January 14, 1978 at the Port of Las Piedras, Paraguana (Amuay), Venezuela. The cargo was covered by two separate bills of lading, whose terms have no particular relevance in this case. The cargo was to be carried aboard the M/V PHGH from Venezuela to Callao, Peru.

---

**5.** The mere existence of the forfeiture statutes do not preclude this admiralty proceeding, particularly where the private actions were the

first filed and the sale is ordered in the private actions. *See, e. g., The Ermis,* 33 F.2d 763, 764 (S.D.Fla.1929); *Gilmore and Black* at 759.

(b) The master and crew of the M/V PHGH, instead of proceeding properly and with dispatch to the port of outturn stated in the bill of lading, loaded onboard the vessel a cargo of twenty tons of marijuana which was known to be prohibited or regulated by the laws of the United States and of most other nations.

(c) Fully cognizant that this condition of carriage of marijuana made the M/V PHGH subject on certain conditions to seizure and forfeiture by many nations, among them the United States of America, the master and crew of the vessel sailed far afield of the voyage for which it had contracted, through or into waters subject to the jurisdiction of the United States, in which the vessel became liable for seizure and forfeiture under the revenue and customs laws or other laws of the United States.

(d) The M/V PHGH was on February 2, 1978 seized on the High Seas by the United States Coast Guard for violation of U.S. law and was brought to Mobile, Alabama where the vessel remained until it was sold in these proceedings. The seizure of course frustrated and aborted the legitimate voyage.

(e) As a legally sufficient consequence of the wrong alleged, Rayon Y Celanese Peruana was damaged in the amount of $143,-900.93.[6]

### C. *Voyages.*

1. The M/V PHGH, during approximately the last year of its operation, made the following voyages in the following order by time, from last voyage to earliest, all as ascertained from testimony of crewmembers in the criminal case in this Court:

a. Venezuela to Peru with sulfur (voyage aborted by seizure);

b. Ecuador to Venezuela to pick up sulfur;

c. Haiti to Ecuador with cement;

d. Philadelphia to Haiti with iron ore;

e. Brazil to Philadelphia to pick up iron ore;

f. Guana to Brazil with iron ore.

The Government contends that, to be perfectly accurate, the last "voyage" was the dope smuggling deviation toward the United States taken from the Venezuela/Peru voyage, so that the Venezuela to Peru voyage was technically the *next*-to-the last. We need not decide this point, since the priority dispute does not turn on it. The Government's claim, to the extent it is valid, primes all others as a *custodia legis* claim, and the claim of Raycel was the only claim to accrue on *either* the dope smuggling deviation "voyage" or the legitimate Venezuela/Peru voyage. Accordingly, for purposes of simplicity, we will treat the last legitimate voyage—Venezuela/Peru—as the last "voyage".

2. The claim of Rayon Y Celanese Peruana, S.A. arises out of the last voyage made by the vessel, from Venezuela to Peru, and is the only claim arising on that voyage.

3. The claim of Agence Martine arises out of the third-to-the last voyage, the voyage from Haiti to Ecuador, on or about December 2, through 9, 1977, and is the only claim arising on that voyage.

4. The claim of Curtis Bay Towing Company arises out of the fourth-to-the last voyage, from Philadelphia to Haiti, for docking and sailing services performed in Philadelphia on November 10, 11 and 16, 1977, and is the only claim arising on that voyage.

5. The claims of Societe Nigeria, ARB, Le Parco, and Dekytspotter occurred on voyages occurring earlier than those listed above.

---

6. Raycel has reserved the right, should its wrongful seizure claim be reversed and remanded to prove additional items of damage. Because Raycel's claimed damages exceed by many multiples the funds in the Registry of this Court, it is not necessary to consider each item of claimed damages. Suffice it to say that Raycel is clearly entitled to damages beyond the amount in the Registry.

6. The evidentiary basis of these findings concerning the order of voyages is as follows:

a. Since all the crew members have been deported, there are no available witnesses to testify on these important facts. However, the "Stipulation of Facts" filed in the earlier criminal case in this Court contains this information, and that stipulation—offered by Raycel—is admissible in this case under Rules 803(24) or 804(b)(5) of the Federal Rules of Evidence.

b. In the alternative, this Court is entitled to take judicial notice of the contents of the stipulation. *State of Fla. Board of Trustees v. Charley Toppino and Sons, Inc.,* 514 F.2d 700, 704 (5th Cir. 1975). Raycel asks that we do so.

### III. *Conclusions of Law.*

#### A. *Choice of Law.*

■ 1. *Nature of Claim.* No party has pleaded or proved foreign law, though many of these claims could arguably arise under the law of other nations. In the absence of proof of foreign law, however, foreign law is presumed to be the same as United States law. *Symonette Shipyards, Ltd. v. Clark,* 365 F.2d 464, 468 (5th Cir. 1966), *cert. denied,* 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967). Such a presumption is clearly appropriate in a maritime commercial context, where bodies of law tend to draw upon similar sources.

■ 2. *Ranking of Liens.* Even if the claims of the various parties in this case had been made under foreign law, the general maritime law of the *United States* would still determine the ranking and priority of all lien claims. *See, e. g., Potash Co. of Canada, Ltd. v. M/V RALEIGH,* 361 F.Supp. 120, 124 (D.C. Zone 1973). We proceed, then, to determine the priority of these various lien claims.

#### B. *Lien Priority.*

■ 1. *In General.* Competing maritime lien claims are *first* ranked according to *class.* G. Gilmore and C. Black, Handbook on The Law of Admiralty 737 (2d ed. 1975) ["Gilmore and Black"]; G. Varian, *Rank and Priority of Maritime Liens,* 47 Tulane L.Rev. 751 (1973). The classes are, from highest priority to lowest, the following:

1. Expenses of justice during custodia legis;

2. Seamen's liens (including those of the Master) for wages; maintenance and cure; and wages of longshoremen when directly employed by the vessel;

3. Salvage and general average liens;

4. Tort liens, including personal injuries;

5. Preferred mortgage liens (U.S. Flag Vessels);

6. Liens for necessaries under the Maritime Lien Act of 1920;

7. State-created liens of maritime nature;

8. Maritime liens for penalties and forfeiture for violation of federal statutes;

9. Perfected non-maritime liens, including tax liens;

10. Attaching liens in causes of action within the admiralty and maritime jurisdiction (foreign attachment); and

11. Maritime liens in bankruptcy.

G. Varian, *Rank and Priority of Maritime Liens,* 47 Tulane L.Rev. 751, 753 (1973). *Accord, Gilmore and Black* at 737 n. 307(c). Once competing liens have been ranked according to class, the top priority liens will of course be paid first. If the funds are insufficient to pay the next lower ranked class in full, the available funds will be distributed among claimants in that class according to rules operating within that class. The rules may of course vary from class to class.

Applying this ranking to the claims in this case yields the following results.

■ 2. *Expenses of Justice.* While technically a claim for expenses *in custodial*

*legis* may not be a "lien" claim, it nevertheless is paid before any others. *New York Dock Co. v. THE POZNAN,* 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927); *Bender Welding & Machine Co. v. M/V SOVEREIGN OPAL,* 415 F.Supp. 772, 773 (S.D.Ala. 1976); *Gilmore and Black* at 737.

■ All custodial claims have been paid on an interlocutory basis except the claim of the United States. The United States has claimed $30,615.83 but has proved a custodial claim in the amount of only $17,984.90, and is entitled to the repayment thereof from the proceeds of sale as a "superpriority" item.

■ The Government is not entitled to guard and custodial expenses incurred prior to March 31, 1978, because of the following reasons *in addition* to the ground that (as previously discussed) they are not reasonable as a matter of *fact*:

(A) the expenses accruing prior to March 31 were not incurred as Court-appointed custodian in this case; since the sale of the vessel occurred at the instance of a private libel and not in a forfeiture proceeding, the only claim of entitlement the Government has to these sale proceeds is as an ordinary custodian;

■ (B) the terms of 19 U.S.C. § 1613 are inapplicable because the sale was not "under the provisions of the [forfeiture] chapter" of the code, *id.,* but even if it had been the Government would not be entitled to recoup guard and dockage costs incurred prior to March 31, for three reasons:

First, the pre-seizure expenses are not "proper" within the meaning of 19 U.S.C. § 1613(a)(1) because of the unreasonable delay of the Government in filing forfeiture proceedings "forthwith . . . without delay . . .", as required by statute. 19 U.S.C. § 1604.

Second, even if 19 U.S.C. § 1613 were interpreted to allow the pre-March 31 expenses, the statute would be unconstitutional in its operation by virtue of the Government's delay of four and one-half months before filing forfeiture proceedings. *United States v. Thirty-Seven Photographs,* 402 U.S. 363, 368 n.2, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).

■ Third, the Government's four and one-half month delay in filing forfeiture proceedings makes its claim for pre-March 31 custody expenses barred by laches. *Watz v. Zapata Off-Shore Co.,* 500 F.2d 628, 632 (5th Cir. 1974). Not only was the Government forfeiture claim inexcusably delayed here, the other claimants were clearly prejudiced by the delay at the rate of $200.80 per day.

■ (C) If the Government's claim—or any part of it—is presented as a forfeiture or penalty claim rather than as a claim for custodial expenses, it is primed by all valid maritime tort or contract liens, as shown by the lien ranking schedule previously set out.

■ 3. *Tort Liens.* Since there are no seamens' wage, salvage, or general average claims, the second applicable priority is that of tort claims.

■ (A) *Claim of Raycel and Societe Nigeria in Same Class.* There are only two claims in this case which are arguably tort claims: the cargo damage claim of Societe Nigeria National Supply Co., and the claim of Raycel. While there do not appear to be any reported cases discussing the lien priority of a claim such as that of Raycel, it should probably be regarded as analogous to a cargo claim, since marine cargo law has long provided a cargo claim for deviation, in the sense of an intentional change in the geographical route of the voyage as contracted.[7] The Carriage of Goods by Sea

7. Payne and Ivamy, Carriage of Goods by Sea 88–89 (10th ed. 1976) ("[I]t is implied in all bills of lading that no deviation will be made from the contractual route, unless such deviation is justified, *i. e.,* where it is made for purposes necessary for the prosecution of the voyage or

Act specifically provides that a deviation for purposes of loading or unloading cargo—as this narcotics deviation clearly was—is "prima facie . . . unreasonable". 46 U.S.C. § 1304(4). See also *Hellenic Lines, Ltd. v. United States,* 512 F.2d 1196, 1206 (2d Cir. 1975). Under COGSA, in the event of such a geographic deviation, if the goods carried are stranded in a distant port other than the port of outturn, Cargo has a right of action for "costs at and onward transportation from" the port at which the goods are stranded. 512 F.2d 1210.

Accordingly, the claim of Raycel will be considered to be a cargo claim in the same class as—but not necessarily the same priority with—that of Societe Nigeria.

■■■ (B) *Dual Nature of Marine Cargo Claim.* It has never been perfectly clear in the maritime law whether for lien priority purposes a marine cargo claim must necessarily be an action in tort or, on the other hand, an action in contract for breach of the contract of carriage (bill of lading). In an action for cargo damage, "[s]uit can always be brought in tort or in [contract] . ." W. Tetley, Marine Cargo Claims 69 (2d ed. 1978). Accord, G. Gilmore and C. Black, Handbook on the Law of Admiralty 630 (2d ed. 1975) ("These hybrid claims may be looked on as arising out of contract . . or out of tort"). Such a claim is probably a tort claim rather than a contract claim. G. Varian, *Rank and Priority of Maritime Liens,* 47 Tulane L.Rev. 751, 757 (1973) ("new areas of tort were . . . opened up and there are now a variety of instances in which liens usually sounding in contract, such as breach of contract of carriage . ., have been classified as 'tort' liens"). Whether a cargo claim sounds in tort or in contract makes no difference for purposes of this case, though, because in *either* event

the claim of Raycel primes all other claims except that of the *custodia legis* claim of the Government.

(C) *If the Two Cargo Claims Sound in Tort, the Claim of Raycel Primes that of Societe Nigeria.*

■■ (i) *Raycel's Claim Arose Last.* If the two cargo claims are viewed as tort claims, Raycel's claim has priority because it indisputably accrued last. As between several tort liens, the last one to accrue primes the earlier ones under what is known as the "inverse order rule":

> The inverse order of priority rule is applicable to tort liens so that when successive torts occur, even on the same voyage, the later tort takes priority over the earlier one.

G. Varian, *Rank and Priority of Maritime Liens,* 47 Tulane L.Rev. 751, 757 (1973). Accord, Gilmore & Black at 742–43.

■■ (ii) *The Claim of Societe Nigeria is Time-Barred.* Even if the claim of Raycel did not prime the other cargo claim under any other principle of priority law, it would do so in this case because the claim of Societe Nigeria is time-barred. It is alleged to have accrued—*i. e.,* delivery was made—on January 26, 1977. The claim was not filed in this case until May 29, 1978, sixteen months later. The Carriage of Goods by Sea Act [8] provides that "the ship shall be discharged from all liability . . . unless suit is brought within one year after delivery of the goods . . ." 46 U.S.C. § 1303(6). The one-year rule is not a United States anomaly; it is an integral part of the Hague/Visby Rules,[9] and is incorporated as well in the law of France,[10] the only other jurisdiction whose law might arguably—if properly raised—apply to that claim. Thus, regardless of priority rules, the claim of Societe Nigeria—being time-

---

for the safety of the adventure, or to save human life").

**8.** United States Law is, as already stated, applicable in the absence of proof of foreign law.

**9.** W. Tetley, Marine Cargo Claims 331 (2d ed. 1978).

**10.** *Id.* at 344–45.

barred—cannot be made the basis of recovery.

 Societe Nigeria claims in its affidavit that the owners of the vessel kept it "hidden" and changed her ownership and name in order to avoid, if possible, its being libelled. Assuming the truth of this contention, it does not toll the running of the COGSA statute of limitations. There is no reported decision so holding, and this Court shall not import any judicially-created "exception" into a stark and clear statute of limitations long ago enacted by Congress based upon an internationally drafted maritime code for cargo damage litigation. Such a change of law, even if desirable, is the province of the Congress and not the Courts.

 4. *Contract Liens.* The rule governing priority of competing maritime contract and supply liens is that all contract and service liens from the *same* voyage have an equal priority and share *pro rata* ; but are primed by *all* the contract and service liens "which accrue in connection with the next voyage". Gilmore & Black at 744; G. Varian, *Rank and Priority of Maritime Liens,* 47 Tulane L.Rev. 751, 760 (1973).

 Applying that rule to this case, the claim of Rayon Y Celanese Peruana, S.A. would—even if both the cargo claims are treated as contract claims—prime all other competing claims, because the Raycel claim was the *only* claim accruing on the last voyage.

 5. *Priority of Raycel Claim Moots All Other Claims.* The Raycel claim, of course, is many times larger than the funds in the registry of the Court. It is clear that, whether viewed as a tort or as a contract claim, the Raycel claim is the first priority claim and it primes all other claims after the Government's. The proceeds remaining in the registry of this Court after payment of the Government will, therefore, be ordered to be paid to Raycel.

6. *Laches.* While it is not necessary to reach the issue because the priority question resolves the case, this Court would alternatively hold that the claims of Dekytspotter, Le Parco, and Societe des Avitailleurs are barred by the doctrine of laches. *Watz v. Zapata Off-Shore Company,* 500 F.2d 628, 632 (5th Cir. 1974). The Raycel claim would, of course, prime any unbarred claims.