**BROMFIELD MFG. CO., Inc., et al.**

v.

**The BROWN, SMITH & JONES, et al.**

No. 52–65.

United States District Court
D. Massachusetts.

Jan. 6, 1954.

Gerald Gillerman, Brookline, Mass., Slater & Goldman, Boston, Mass., for libellant Bromfield.

Louis A. Macey, Boston, Mass., for Capt. R. O. Malmberg, intervening petitioner.

Thomas H. Walsh, Boston, Mass., for respondent Home Ins. Co.

Max L. Glazer, Boston, Mass., for respondent Murray Sandler.

FORD, District Judge.

Bromfield Manufacturing Co., Inc., brings this libel against the yacht Brown, Smith & Jones, setting forth its claim for $10,547.95 for materials, labor, and services furnished for the repair of said yacht. It was later permitted to amend its libel to make Murray Sandler, the owner of the yacht, a party respondent, and to assert its in personam claim against him for the same amount. Sandler filed claim as owner of the yacht, and also brought in as a party respondent the Home Insurance Company, alleging that libellant's services had been furnished in repairing injury to the vessel for which the insurance company was liable under a policy issued on the vessel. Libellant asks also a decree in its favor for any amount owed to respondent Sandler by the insurance company. Captain Richard O. Malmberg was allowed to intervene, seeking to be allowed to share in the proceeds of the sale of the vessel to satisfy his claim for $2,000 for services rendered as captain of said vessel.

The yacht Brown, Smith & Jones was purchased by Sandler at Baltimore, in May, 1952. A survey of the vessel made at that time showed it to be apparently seaworthy. Some deadwood was found in the forepeak above the water line. No borings were made to test the soundness of structural members and no parts were removed to expose parts ordinarily concealed. On May 14, 1952, respondent Home Insurance Company issued to Sandler and another, as owners, a policy of insurance on the vessel, covering among other items damage from perils of the seas. On its subsequent voyage to Boston, the vessel was involved in two accidents which caused considerable damage. On June 1, 1952, in Delaware Bay, it collided with a buoy which struck it on the starboard side of the stern. On June 4, 1952, while attempting to anchor in a swift current in the Harlem River, in New York, it struck a bridge on its port side.

Temporary repairs were made after these accidents and the yacht proceeded to Boston, where it was taken to the yards of libellant on June 15, 1952. It was there hauled up on the ways and inspected. The platform poop deck over the stern had to be removed to permit determination of the full extent of the damage. The vessel was examined at this time also by Mr. Robert Stanton Fox, a naval architect representing Sandler, and another naval architect, Mr. William S. Henry, representing the under-

writers. Agreement was reached on the repairs which were necessary and Fox gave libellant a work order therefor. These repairs, and additional work on the vessel which was later requested from time to time by Sandler, were performed by libellant. All the work done was included in Fox' work order or was performed at the express request of Sandler. The work was done in a skillful and workmanlike manner, and was completed in August, 1952. Thereafter, libellant refused to perform further work which Sandler wanted to have done until some payment was made, but later agreed to take the boat out for a trial run on November 1. The charges made by libellant for the work, materials and services furnished, including wharfage charges at its yard, amounting in all to $10,547.95, are fair and reasonable.

█ In defense, Sandler claims, first, that libellant agreed to perform all the necessary repairs for a fixed sum of $5,-000, and that its recovery should be limited to that amount. Sandler's testimony as to such an agreement is vague and unsatisfactory and in the light of the testimony of libellant's president, Bromfield, and its superintendent, Sanchez, this claim must be rejected. In view of the condition of the vessel Bromfield and Sanchez refused to make any estimate of the total cost of the work. Moreover, from time to time, Sandler added further items to the work originally requested. On such occasions he was told by Bromfield that the cost of the work was mounting rapidly. This was done when the total charge had reached approximately $5,000 and again when it was $6,500, $8,000, and finally $9,000. Sandler on such occasions always insisted that he wanted the work to continue. Moreover, he received, without protest, a statement on account rendered by libellant, on July 24, for $4,000, at a time when the work was still far from completion.

█ Sandler further argues that libellant has failed to complete the work on the yacht in a proper manner. The only basis for this complaint, so far as the work done by libellant is concerned, is that the vessel still leaks badly, as was shown particularly during its trial run. The fact is, however, as appears from the agreement of all the witnesses, that the structural framework of the yacht, which was built in 1894, is badly rotted. The timbers are so badly deteriorated that they can no longer hold tight the fastenings of the planking and as a result the seams are sprung so wide that they will no longer hold the caulking. Even though the work done by libellant was properly done the condition of the framework of the yacht is such that these repairs could not make the vessel watertight. Moreover, this was made known to Sandler when the removal of the superstructure and planking in the course of the work had revealed the rotted condition of the timbers. Bromfield and Sanchez both advised him against the doing of the additional work which he thereafter requested on the ground that it would not be worth doing in view of the condition of the vessel. It is this condition, of which Sandler was warned, and not any failure of libellant to perform properly the work it was hired to do, which is responsible for the defects in the vessel of which Sandler now complains. Libellant is entitled to recover the full amount of its claim against the vessel and against respondent Sandler.

█ Respondent insurance company does not contest the fact that it is liable under its policy to pay for the damage caused to the vessel by the two accidents. It has in fact already paid to Sandler the sum of $5,396.81, in partial settlement of that liability. Sandler claims that all the repairs made on the boat by libellant or others were necessitated by the accidents and that the insurance company should be held liable for the full cost of them all. It is clear, however, that some of the work, at least, was not to repair accident damage but for normal maintenance or improvements desired by Sandler. Many items were in fact requested by him long after the original work order which was based

on the accident damage as shown by the inspection made before the repairs were started. The only evidence as to which items are properly chargeable to the accidents is the testimony of Henry, the marine surveyor who examined the boat for the underwriters. No testimony was offered to contradict his opinions as to the proper allocation of the items of work as between the two accidents and work properly chargeable to the owner as not being necessitated by either accident.

Of the original bill for repairs submitted by libellant on August 21, 1952, items totalling $4,163.73 are properly charged to the Delaware Bay accident, and $1,233.03 to the Harlem River accident, while the remaining items of $3,953.75 were not chargeable to either accident. This allocation of the items of the August 21 bill was in fact agreed upon by Sandler and Fox at a meeting with Henry, Bromfield, and Sanchez, on September 30, and was the basis on which partial payment was made by the insurance company. Several other items, not included in this original allocation, are also chargeable to the accidents, including $314.50 for damage to the tender and rigging, loss of property from the yacht and salt water damage, $351.78 of the total cost of $703.58 for repairs to the steering gear, and $300 of the item of $406.05 for repairs to the gas generator. There was damage done by salt water in the engine but the whole cost of repairing this is not chargeable to the accidents. As Henry testified, the real damage could have been prevented by proper flushing of the engine in time. Instead the salt water was allowed to remain for some time after the vessel had been hauled up out of the water. A fair allocation for repair of the accident damage would be the item of $241.03 charged by libellant for opening up and cleaning the engine, but not the additional sums paid to the Wolverine Company for engine repairs. The sum of $137.50, one-half of Fox' charge of $275 for his services in connection with the work done on the ves-

sel, is also properly charged to the accidents. The total liability of the insurance company under its policy is thus $6,741.57. Of this $5,396.81 has been paid, leaving a balance owed by the respondent insurance company of $1,344.76, which libellant is entitled to recover.

Captain Malmberg's claim for wages is based on the following facts. In August of 1952, Malmberg was hired by Sandler under an agreement by which he was to be master of the vessel at a salary of $400 per month whenever the vessel put to sea. Until such time as the vessel was taken out to sea Malmberg was to remain on board as caretaker, for which he was to be paid $300 per month. The vessel, of course, never put to sea, Malmberg was paid $300 per month through December, 1952. Beginning in January, 1953, Sandler paid him $100 each month on account. He remained on the boat as caretaker through October, 1953.

The libel in this case was filed December 11, 1952, and the yacht was taken into the custody of the Marshal at the libellant's yard on December 12, 1952, and one Spencer, libellant's timekeeper, was appointed custodian thereof without pay. No one interfered with Malmberg's remaining on the boat until sometime in November, 1953, when Sanchez ordered him from the boat and he was refused further admittance to the yard. He never served as custodian for the Marshal, and there was no evidence that the Marshal knew of or approved his presence on the vessel.

Under these circumstances Malmberg could acquire no lien against the vessel, and is not entitled to share in the proceeds of the sale to satisfy his claim. The unpaid wages he claims, $200 per month from January through October, 1953, are all for the period after the boat had been taken into the custody of the Marshal. No maritime lien can be allowed for wages to seamen accruing after the libeling of the ship. Old Point Fish Co. v. Haywood, 4 Cir., 109 F.2d 703, 705, and cases there cited. This is not a case where, as in The

Young America, 2 Cir., 30 F. 789, the vessel after a purely formal seizure by the Marshal was permitted, with the consent of libellant, to pursue her ordinary business as before in such a way as to mislead and deceive third persons dealing with it. Malmberg knew of the vessel's arrest at the time. He was in no way misled. His remedy must be sought against Sandler who hired him, and not against the vessel. His petition to share in the proceeds of the sale of the vessel must be dismissed.

Decree in accordance herewith.