Floro Herrera **MEDINA**, (Master), Sergio Aros, et al., Plaintiffs,

v.

**MARVIRAZON COMPANIA NAVIERA, S. A., et al., Defendants.**

**NATIONAL SUGAR REFINING COMPANY, Plaintiff,**

v.

**M/V CONSTANTINOS, Her Engines, Tackle, Boilers, etc., in rem, and Saint Constantinos Shipping Company, Defendants.**

Civ. A. Nos. 79–814–G, 79–926–K.

United States District Court, D. Massachusetts.

March 12, 1982.

Myron Boluch, Boston, Mass., for plaintiffs in 79–814–G.

Paul Sullivan, Bagley & Bagley, Boston, Mass., for defendants in 79–814–G.

Bingham, Dana & Gould, James F. McHugh, Boston, Mass., for plaintiff in 79–926–K.

Glynn & Dempstey, Thomas Muzyka, Boston, Mass., for defendants in 79–926–K.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

On April 20, 1979, the crew of the M/V Constantinos instituted an action against the M/V Constantinos and various alleged owners and charterers, and arrested that vessel at its berth in Charlestown, Massachusetts. The action was within this court's admiralty subject matter jurisdiction, 28 U.S.C. § 1333, and was identified as an admiralty and maritime claim under Rule 9(h), Fed.R.Civ.P., and process against the vessel issued under Admiralty Rule C. In succeeding weeks, another 20 parties arrested the M/V Constantinos to assert various claimed liens. The court ordered the vessel sold on May 16, 1979, and the public sale, which the marshal held on June 6, 1979 and which the court confirmed nine days later, produced a fund of $111,000.

Since seven parties voluntarily dismissed their claims, 14 remain asserting liens against that fund. The crew, including its captain, seek back wages and other amounts. Dr. Elias Tsavaris claims a seaman's wage lien for money he advanced to satisfy obligations of Saint Constantinos Shipping Company (hereinafter, Saint Constantinos), the crew's employer, to the crew. Port Terminals seeks reimbursement for wharfage services rendered the vessel for part of the period the ship was arrested. National Sugar Refining Company (hereinafter, National Sugar) which had chartered the M/V Constantinos to transport a cargo to North America, asserted liens for cargo damage and loss. It also claims a lien for demurrage and other expenses incurred when a second vessel it had chartered to transport a similar cargo, the M/V Fortune Carrier, was delayed in discharging because the M/V Constantinos occupied its berth. A fifth party alleges a breach of a charter party and nine others present claims for a variety of services and supplies rendered the vessel.

The court referred these consolidated cases to a special master, Bertram E. Snyder, Esquire, on March 13, 1980, pursuant to Rule 53, Fed.R.Civ.P. The order of reference specified matters for the master to address and further provided that he should "also consider any other issues raised by the parties in their memoranda and any that may arise during the course of the hearings before him." In a clarification issued on May 21, 1980, the court made clear that the special master was "authorized to hear and determine *in personam* claims related to *in rem* claims" asserted in the cases referred to him. The issues as defined by the court, and as refined by the special master, are set forth on pages 7–9 of the "Master's Report" filed September 1, 1981. On September 3, 1980 the court also referred to the special master the application of plaintiff-interve-

nor National Sugar for confirmation of an arbitration award. The special master made recommendations on this issue in a six-page report served on the parties on September 17, 1980. The special master received memoranda, held hearings and received evidence on the issues assigned to him, and submitted his report to the court on September 1, 1981. Objections were filed by several parties, and the court heard them on November 23, 1981. Having considered the papers filed in this case, including the "Master's Report", the objections to it, and the parties' memoranda, and the arguments made at the hearing, we make the following rulings and reach the following conclusions.

## I. Findings of Fact

Finding them not to be "clearly erroneous", Rule 53(e)(2), Fed.R.Civ.P., the court adopts, and incorporates by reference, the findings of fact made and reported by the special master on pages 10 to 20 of his report, with the following modifications and additions. In finding # 21 on page 14, we change the date of confirmation of the vessel sale to June 15, 1979 from June 11, 1979. Pursuant to the objection of the plaintiff crew and captain, the court corrects finding of fact # 49 at page 17 to read: "Paul William Garber of the Chilean Consulate, fluent in Spanish, was present during the negotiations concerning the crew's and captain's claims." We add to "finding of fact" # 72 on page 20 the sentence, "National Sugar's claim, as confirmed by its counsel at the court's hearing on November 23, 1981, is for $43,744.54." and we insert that figure in place of the $43,762.69 figure on page 41 in the second line. The court also states, as a finding of fact, that "Saint Constantinos owes Captain Herrera 1) $5,254.60 for back wages, 2) $8,466.62 (126 days at $66.60 per day) for January 1 to May 7, 1979, 3) $2000 as one month's vacation pay, 4) passage to San Salvador of $163.00, or a gross total of $15,884.22 less $5000 received, for a net total of $10,-

884.22." Accordingly, we strike the similar language from page 29 of the "Master's Report.". We also find, based on its lawyer's letter of September 10, 1981, that Strachan has a claim for $29,548.84, not $32,048.84 as stated on page 58 of the "Master's Report." Finally, at the request of the crew and based on the testimony of an expert on Panamanian maritime law and on the filings of various records, we find that under Panama law the captain of a Panamanian vessel would have the status of a crew member.

## II. Uncontested Issues

Since the parties have not objected to them, and since they are supported in law and fact, we adopted at the November 23, 1981 hearing, or now adopt without further discussion, the following conclusions reached by the master. These are:[1] 1) that the prohibition of lien clause in the Marvirazon charter party was ineffective since materialmen lacked notice (p. 36); 2) that Port Terminals has a valid claim for $5400 dockage fees, and that this claim, though not a maritime lien, entitles Port Terminals to preferential payment over all maritime liens since Port Terminals rendered services for the benefit of the property and its claimants and looked to the vessel for repayment (pp. 36–38, 58); 3) that National Sugar has a maritime lien for cargo damage and shortage of $24,093.77; 4) that National Sugar has a claim, with tort lien status, for $3,784.57 for breach of charter party (pp. 39–40); 5) that National Sugar has a valid in personam claim for $90,540.51 against Saint Constantinos representing its August 1, 1980 arbitration award but that that award does not bind those not party to the arbitration proceeding; 6) that the following materialmen have maritime liens for necessaries under 46 U.S.C. § 971 in the amounts stated on page 58 of the "Master's Report" as revised on September 10, 1981: Gulf Water, Dixie, All Ships, Atlantic and Gulf, Weber, New Star, Boland and Hellas; 7) that Strachan has a maritime lien for

---

1. Page citations in parentheses throughout this memorandum refer to the "Master's Report" of September 1, 1981.

necessaries under 46 U.S.C. § 971 for $29,-548.84; 8) that Navegadora Golfo does not have a claim (p. 55); 9) that the special master has correctly stated and applied the rules regarding priority of liens in grouping the materialmen's liens (pp. 50–55);[2] 10) that the special master's conclusions regarding the awarding of prejudgment interest are correct (pp. 57–58); 11) that the crew is not entitled to penalty wages (p. 27). We turn now to parts of the report to which objections have been filed.

III. Objections of Captain and Crew

The captain and crew object to the special master's report in several respects. They object, first, to the special master's conclusion that members of the crew who signed releases are not entitled to a maritime lien for seamen's wages. They argue that the releases were signed under duress and are, accordingly, not valid.

■ Seamen are, of course, wards of admiralty. That status confers upon them the special solicitude of the courts, one aspect of which is judicial scrutiny of a seaman's release of wage or injury claims. In *Garrett v. Moore-McCormack Co.*, 1942, 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239, the Supreme Court held that "the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights." The rule applies to releases of wage claims as well as to other claims. *Lewis v. Texaco Inc.*, 2 Cir. 1975, 527 F.2d 921. The adequacy of consideration and availability of the relevant professional ad-

vice were deemed to be factors pertinent to that inquiry. See also *Scola v. Boat Frances R., Inc.*, 1 Cir. 1976, 546 F.2d 459.

■■ Accordingly, those who offer the releases to preclude the crew from asserting wage liens bear the burden of proving that the releases were executed freely. This they have not done. The crew was represented by counsel competent in maritime law. A translator was also present though he did not act as the crew's lawyer. And the release-signing crew did receive $41,-884.40. These facts do not satisfy the burden of proving that the releases were freely executed. The crew was in a foreign land which used an unfamiliar form of currency. Its members did not speak English and were apparently uneducated. The crew was owed substantial back wages. The owner's past promises of payment had been honored in the breach. Payments had been little and late. Further, according to Captain Herrera's deposition testimony, at the time the releases were signed little or no food remained on board. The general picture—of a foreign crew far from home, not speaking English, lacking money and short on food—suggests that the crew may not have acted freely. Moreover, the conduct of Saint Constantinos and its agents further suggests that they regarded the releases as nullities, for even after releases were signed, they continued to make some wage payments.

Since a party holding up a seaman's release bears the burden of proving that it was freely executed,[3] and since no party has

---

2. When, as is here the case, the valid liens asserted exceed the fund produced by the sale of the vessel, the court faces essentially a problem of determining how to distribute insufficient funds among the claimants. The court must determine first whether a valid lien exists and if one does, what priority it has relative to other liens. The latter inquiry depends on how a lien is characterized and when it arose. See Connor, "Maritime Lien Priorities: Cross-Currents of Theory," 54 *Michigan Law Review* 777-820 (1956). Courts generally follow a fixed ordering of the classes of liens as summarized here: claims allowed by the court as expenses for the administration of justice, which are not, strictly speaking, liens; sea-

men's wage liens, salvage and general wage liens; tort liens; contract liens; maritime state liens; government liens; non-maritime liens; and non-lien maritime claims. See 2 *Benedict on Admiralty*, § 51 (7th ed., 1980). Later liens of a class take precedence over earlier liens of the same class.

3. In most cases where courts have applied this rule, the party holding up the seaman's release has been a shipowner or seaman's employer who is liable to the seaman in contract or tort. Although those parties might have raised the issue here, the parties most likely to raise the issue are those claiming a maritime lien inferior to a seaman's wage lien. It is more difficult for

done so here, we sustain the objections to the releases. Accordingly, the release-signing crew members can claim a maritime lien for seaman's wages. We recommit this issue to the special master to determine, if possible,[4] the amount of the wage liens of the individual members of the crew.[5]

■■ The captain and crew also object to the finding of the special master that the crew, including Chief Engineer Espinosa, and the captain were not entitled to liens for wages after April 20, 1979, the date when the vessel was seized. No new liens for seamen's wages may accrue against a vessel in the marshal's custody. *Bromfield Mfg. Co. v. The Brown, Smith & Jones*, D. Mass. 1954, 117 F.Supp. 630, 633. Under some circumstances, however, a court may allow a claim for services rendered to a vessel *in custodia legis* which inure to the common benefit of those interested in the fund, *New York Dock Co. v. S.S. Poznan*, 1927, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 even if the court has not previously authorized the services. Here, however, we are not convinced that the crew remained on board to render services for the common benefit of all with claims against the ship rather than because it lacked alternate shelter. See generally, G. Gilmore and C. Black, *The Law of Admiralty* (2d ed. 1975) pp. 602–606. Moreover, the special master was not clearly erroneous in finding insufficient credible evidence to allow the crew a claim for breach of contract after April 20, 1979. Accordingly, we find that the special master did not err in denying these claims.

We further sustain, against objections, the special master in reducing the claims of Captain Herrera and Chief Engineer Espinosa by the $5000 they already received. Plaintiffs contend that these payments were designed to induce these officers to remain aboard and to enlist the crew's assistance in moving the vessel and should not be credited against their claims for back wages. We reject this argument since the documents Herrera and Espinosa signed acknowledging receipt of the money clearly described the payment as an advance on back wages. We therefore affirm the special master's finding that Chief Engineer Espinosa has an *in rem* claim of $5991.47, as described on pages 29–30, and that Captain Herrera has an *in personam* claim of $10,884.22.

■ Captain Herrera also objects to the special master's conclusion that he is not entitled to a seaman's wage lien, which as discussed above would entitle him to a high priority claim *in rem*. The special master pointed out that in *Payne v. SS Tropic Breeze*, 1 Cir. 1970, 423 F.2d 236, 244, cert. denied *sub nom. Samadjopoulos v. National Western Life Ins.*, 1970, 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 the court held that the term "crew" as used in 46 U.S.C. § 953(a)(2) did not cover a vessel's master. He also noted that 46 U.S.C. §§ 600–601, 606–608, provides masters of American vessels liens for wages equal in stature to

those who were not parties to a transaction to prove how those who were involved acted. Still, the primary purpose of the burden shifting rule of *Garrett v. Moore-McCormack Co., supra*, and *Scola v. Boat Francis R., Inc., supra*, is to protect seamen, and we conclude that it should apply as well against third parties.

4. Since the special master denied the release-signing crew a seaman's lien for wages up to April 20, 1979 on the grounds that the releases were valid, he did not make findings explicitly on the question of the amount of their claims up to that date. He may, however, have implicitly addressed this issue on pages 24–26 of his report. It would seem that the crew members rely heavily on Herrera Exhibit G to establish the amounts of their liens (p. 24). In the course of his discussion denying the crew re-

covery for breach of contract *after* April 20, 1979, the special master concluded, however, that other submissions by the crew "totally destroy the probative value" of that document (p. 26). Therefore, our conclusion that the releases are invalid may not lead to recovery by the crew members unless other evidence exists to establish the amount of the wage liens of the crew up to April 20, 1979. Because of the special master's familiarity with the evidence in this case, we recommit this issue to him with the request that he report either the amount of the wage liens of the crew or that there is insufficient credible evidence to determine their claims.

5. Amounts already received would not, of course, be included in the amounts still due.

seamen's wage liens. Since the M/V Constantinos was not an American vessel, however, the special master denied Captain Herrera a lien.

The captain's position has some merit. The Ship Mortgage Act of 1920, 46 U.S.C. § 911 et seq., which *Payne* construed and the special master cited, states the position of preferred ship mortgages relative to various other maritime liens. See 2 *Benedict on Admiralty, supra* at § 52. The cases presently before us do not call for the application of that statute since they raise no issue regarding the priority of a ship mortgage. Accordingly, 46 U.S.C. § 953(a)(2) does not govern this case.

*Payne*, too, is distinguishable. In it, the First Circuit decided that as a matter of statutory interpretation, "crew", as used in § 953(a)(2), does not include a vessel's master, so that a master's lien, if one existed, was not a preferred maritime lien under the Ship Mortgage Act. But the court did not reach the question of whether a master had a maritime lien for wages. *Payne v. SS Tropic Breeze, supra* at 241–42 n. 18, 244.

In the absence of issues regarding a preferred ship mortgage, we adopt the general order of priorities which ranks seamen's wage liens above all other liens. See note 2 *ante*, 2 *Benedict on Admiralty, supra* at § 51. The question then becomes whether the captain of a foreign vessel is entitled to a seaman's wage lien.

Although seamen have long been entitled to a wage lien with priority over all other liens, the ship's master traditionally had no such lien. The rule was well established by the early nineteenth century, and although twentieth century trial courts later criticized the discrimination as "too strict" and often "unjust", they continued to apply it as established law. See, e.g., *The Mariner*, D. Mass. 1924, 298 F. 108, 109. In 1968, Congress abrogated the decisional authority and granted masters of American vessels a

lien of equal stature to that of a seaman.[6] In so doing, it explicitly recognized and rejected the policy underlying the former rule.

Historically, the master has been denied a lien right for wages comparable to other members of the crew because of the tradition that the master was a part owner of the vessel, had too close a relationship with the owner, or could pay himself out of freight earnings.

Today, however, the role of the master as a participant in the financial aspects of a voyage is, in the vast majority of instances, no different from that of any other member of the crew.

S.Rep.No.1079, 90th Cong., 2d Sess. (1968) *reprinted in* 1968 U.S.Code Cong. & Ad. News, 1889, 1890.

The statute refers expressly only to masters of American ships. But it expresses a policy that where the master is similarly situated to the crew regarding financial aspects of a voyage, he should benefit from the same advantages in satisfying his wages against owners unable or unwilling to pay. The legislative record does not suggest that Congress excluded masters of foreign vessels from 46 U.S.C. § 606 because it wished to deny them the benefit it extended to American vessel captains. It is more likely that Congress did not feel sufficiently knowledgeable about, or able to generalize regarding, the role or status of the master on foreign vessels to extend the benefits of the statute to those in charge of non-American ships. Congress was no doubt wise in not extending 46 U.S.C. § 606 to cover the masters of all foreign ships, since the standing of the vessel's captain may vary in different countries. The relationship between captain and owner on a foreign vessel is best determined by referring to that country's laws defining the master's status. Where a country treats the captain of a vessel of its flag as a seaman for purposes of asserting a wage

---

**6.** Statutory policies, like judicial decisions, provide materials that contribute to the development of common law. Indeed, admiralty courts have applied statutory policies to analogous situations to fill gaps in maritime law.

See, e.g., *Moragne v. States Marine Lines, Inc.,* 1970, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (using wrongful death actions in maritime statutes to imply such an action under general maritime law).

lien, as does Panama, the relevant country for this case, there is a strong argument for an American court, consistent with the policy which 46 U.S.C. § 606 expresses, to accord him the same status and protection.

Although we believe these arguments have considerable force, three other considerations lead us to conclude that Captain Herrera is not entitled to a seaman's wage lien. *Payne* does construe the Ship Mortgage Act, a statute not involved here, but we conclude that the case is intended to, and logically should, govern priorities under general maritime law as well. In a portion of *Payne* that we have not previously mentioned in this memorandum, the Court of Appeals looked to interpretations of language in the Federal Maritime Lien Act, 46 U.S.C. §§ 971–975, to assist in construing identical language in 46 U.S.C. § 951, the Ship Mortgage Act. *Payne v. SS Tropic Breeze, supra* at 240–241. This approach implies that decisions under one of the two statutes also apply to the other. We believe *Payne* can properly support the further proposition that interpretations of terms in those statutes like "other necessaries" or "crew" also apply in construing parallel concepts in the general maritime law of liens. Accordingly, we conclude that the special master properly relied on the decision in *Payne* in determining that Captain Herrera lacked a seaman's wage lien.[7]

Moreover, we believe that logic dictates such an extension of *Payne*. We begin with the basic premise that courts should resolve two cases identically unless a relevant difference exists between them. We further note that *Payne* holds that under the Ship Mortgage Act the master of a foreign vessel is not entitled to a high priority lien. If, however, the law produces a different re-

sult when general and other statutory maritime law, rather than the Ship Mortgage Act, governs, the recovery of a master of a foreign vessel would turn on the irrelevant fortuity of whether the case involved a mortgage on a vessel. To avoid such inconsistent results we conclude *Payne* must cover both situations.

Finally, we note that courts have been reluctant to create new liens. *See, e.g., Vanderwater v. Mills*, 1857, 60 U.S. (19 How.) 82, 91, 15 L.Ed. 554; *Nadle v. M/V Tequila*, S.D.N.Y. 1973, 1973 A.M.C. 909, 913; *In re Admiralty Lines, Ltd.*, E.D.La. 1968, 280 F.Supp. 601, 604–05, aff'd per curiam, 5 Cir. 1969, 410 F.2d 398. See generally Gilmore and Black, *supra* at 633 and n. 105a. Judge Rubin wrote in *In re Admiralty Lines, Ltd.* that "admiralty law has long ago ceased to create new liens." Rather than creating new liens by analogy, courts tend to confine the set of available liens to "those created by statute and those historically recognized in maritime law." *Supra* at 604–605. Treating claims of captains of foreign vessels as a seaman's wage lien is not, strictly speaking, the creation of a new lien and may require only a relatively small step but, in view of the general policy, we decline to take it.

■ Although we conclude that the captain is not entitled to a seaman's wage lien, we do conclude that he possesses a contract lien. Courts have allowed a foreign master a contract lien where the law of the flag gave him a lien. *The Estrada Palma*, E.D. La., 1923, 8 F.2d 103, 104; *The Olga*, S.D. N.Y., 1887, 32 F. 329. See *Payne v. SS Tropic Breeze, supra* at 243. Moreover, the Federal Maritime Lien Act provides that "[a]ny person furnishing ... other necessaries ... to any vessel ... shall have a

---

7. We reach this conclusion although we recognize that the analysis we have employed here differs in some respects from that of the First Circuit in *Payne*. In *Payne*, the Court of Appeals looked to the meaning of "other necessaries" in the Federal Maritime Lien Act; since Congress used identical language in the Ship Mortgage Act, the court concluded that Congress approved the contemporary judicial construction of that term and intended to incorporate it in the new statute. *Payne v. SS Tropic*

Breeze, supra at 241. Here we refer to the interpretation of "crew" in the Ship Mortgage Act to define "seaman" as that term is used in the general maritime law of liens. Thus, *Payne* involved "other necessaries"; this case does not. *Payne* involved the same words used in two contexts; this case involves different language. *Payne* involved inferring congressional intent; this case does not. We do not believe these differences remove this case from the proposition implicit in *Payne*.

maritime lien on the vessel." 46 U.S.C. § 971. Courts construe "[O]ther necessaries" broadly, see Gilmore and Black, *supra* at 658 & n. 185, 2 *Benedict on Admiralty, supra* at §§ 34, 37, and surely a captain's services are necessary. Finally, the First Circuit's decision in *Payne* in no way prevents a foreign master from receiving a contract lien. *Payne* held merely that a foreign master was not entitled to a high priority seaman's wage lien; it did not hold that he had no lien at all.

The amount of Captain Herrera's contract lien is not, however, clear. His *in personam* claim is for $15,884.22 less $5000 received, or for $10,884.22 (p. 29). Part of that amount would appear to represent amounts for periods when the captain would not be entitled to a lien (p. 28). Accordingly, we recommit this issue to the special master to determine how much, if any, of the captain's *in personam* claim constitutes a contract lien.

The crew also objects to the special master's finding that the record did not establish that the estate of crew member Jorge Bossina had a claim for back wages owed him. The record does include six exhibits which *would* establish Bossina's claim for $1273.88. No party challenged the authenticity of the documents when they were filed in the case as attachments to a motion; and no party opposed the claim at our hearing on the "Master's Report." Accordingly, we allow the *in rem* seaman's wage lien of $1,273.88 to Bossina's estate.

## IV.  Objection of Dr. Tsavaris

■■■■ Dr. Elias J. Tsavaris, who advanced $51,884.40 to pay wage claims of the crew, objects to the finding of the special master that he is not entitled to a seaman's wage lien for that amount as assignee of those his funds paid. A seaman's wage lien is assignable. *The Kongo,* 6 Cir. 1946, 155 F.2d 492, 494, *cert. denied,* 329 U.S. 735, 67 S.Ct. 99, 91 L.Ed. 635 (1946), and a person who, acting on the order of one with authority for the ship, advances money to the ship to satisfy wage or other lien claims is entitled to a lien equal in dignity to that met. See *Payne v. SS Tropic Breeze, supra* at 240 n. 12. But the assignee must be a stranger to the title and not someone who is an owner or part owner. 2 *Benedict on Admiralty, supra* at § 26. Although the special master found that Tsavaris did not own the M/V Constantinos, he denied Tsavaris a maritime lien on three independent grounds: that he occupied a fiduciary relationship with the vessel or its owners, that he did not prove that he relied on the credit of the owners rather than on that of the vessel, and that he controlled totally the vessel's destiny at the time his claim arose. Dr. Tsavaris objects to each rationale.

■■■ Dr. Tsavaris' second objection has some merit. The Federal Maritime Lien Act provides that "[a]ny person furnishing ... other necessaries ... to any vessel ... shall have a maritime lien on the vessel ... and it shall not be necessary to allege or prove that credit was given to the vessel." 46 U.S.C. § 971. Some authority includes seamen's wages as within the term "other necessaries," *In re SS Norberto Capay and SS Galicia Defender,* N.D.Cal. 1970, 330 F.Supp. 825; *The Lakeport,* W.D.N.Y. 1926, 15 F.2d 575, and thus would exempt those making such advances from the requirement of alleging and proving reliance on the vessel.[8] Moreover, Dr. Tsavaris correctly argues that control of a vessel's destiny at the moment an advance is made can not alone be sufficient to deny the advancer a lien. For, in a sense, any party who advances funds crucial to furnish a vessel with goods or services essential to its operations which would not otherwise be obtainable controls the vessel's destiny.

We do find, however, that the first ground upon which the special master relied—the nature of the relationship Tsavaris had with the vessel and its owners—suffices to deny Tsavaris a seaman's wage lien. In *The Gloucester,* D. Mass., 1923, 285 F. 579, 582, the court observed:

8.  It is worth noting, however, that advances for seamen's wages which relied on this statute would not have the priority a seaman's wage usually receives but would rather rank with other necessaries. See 2 *Benedict on Admiralty, supra* at § 32, p. 3–12 n. 16.

where a party who would otherwise have a maritime lien has been held not entitled to it because of the relation in which he stood to the vessel, he was either (1) a real part owner of her, or (2) occupied a fiduciary relation towards her and her owners, or (3) dealt with himself on her account. Even within these classes the lien has under peculiar circumstances occasionally been allowed. In other words, the lien is really denied because of insuperable legal difficulties in the enforcement of it, or because—on grounds similar to estoppel—to recognize it would be inequitable to other claimants.

The precise nature of Tsavaris' relationship to the vessel is unclear. The ship's log described him as "owner"; he signed documents which identified him as president; he submitted an affidavit stating that he was formerly a vice president of Saint Constantinos Shipping Company; an acquaintance and associate of Tsavaris in some investments offered an affidavit calling Tsavaris a vice president. Moreover, the special master was not clearly erroneous, and we believe not erroneous at all, in concluding that Dr. Tsavaris' cavalier attitude towards an investment of $50,000 to $60,000—he advanced the funds without receiving any security or promissory note in return—coupled with his willingness to sign documents for the company when corporate officers were present suggest a fiduciary relationship sufficient to deny him a lien. In view of Tsavaris' close relationship to the operating company, it would be inequitable to allow him to assert a lien that would exclude parties whose claims arose from arm's-length transactions with the vessel from recovering *in rem*. We, therefore, sustain the special master's finding that Dr. Tsavaris has an *in personam* claim for $51,884.40 against Saint Constantinos, but no maritime lien.

## V. Objections of National Sugar

National Sugar Refining Company presses four distinct claims. It claims 1) $24,093.77 for damage to and shortage in its cargo aboard the M/V Constantinos, 2) $9,791.77 for expenses incurred in shifting the M/V Constantinos, 3) $43,744.54 for demurrage paid to the M/V Fortune Carrier due to that vessel's inability to offload its cargo since the M/V Constantinos occupied its berth, and 4) $8,587.30 for incidental expenses attributed to the same cause. The first claim, and arguably the second, arose pursuant to the standard charter party agreement—Bulk Sugar Charter; U.S.A. (April 1962 Revised)—between Saint Constantinos and National Sugar, entered into on March 7, 1979, for shipment of cargo aboard the M/V Constantinos. The other two claims relate to losses incurred pursuant to a second and separate charter to ship National Sugar cargo aboard a second vessel. Essentially, approximately three weeks after National Sugar entered into the charter party involving the M/V Constantinos, it entered into a second such agreement, this time with West Coast Carriers Ltd. (hereinafter West Coast) for shipment of its sugar on the M/V Fortune Carrier. That charter provided in part that National Sugar would pay demurrage of $2500 per day with disputes arbitrated in New York. The M/V Fortune Carrier arrived in Boston and gave notice of its readiness to discharge on April 22, 1979. The M/V Constantinos, finished discharging its cargo on April 19, 1979 but, having been arrested, remained at its berth so that the M/V Fortune Carrier was unable to begin discharging until May 8, 1979 and did not finish that job until three days later. Following arbitration pursuant to the charter involving the M/V Fortune Carrier, arbitrators found that National Sugar owed West Coast demurrage and related expenses of $43,744.54. The charter party involving National Sugar and the M/V Constantinos also provided for arbitration, which National Sugar invoked. Saint Constantinos did not appear at that arbitration and National Sugar accordingly received an uncontested award of $90,540.51, which included compensation for the demurrage paid the owners of the M/V Fortune Carrier. The special master determined, properly in our opinion, that the award of $90,540.51 is valid *in personam* against Saint Constantinos but not binding

*in rem* against other claimants who were not parties to that arbitration. Accordingly, the responsibility of the special master, and of the court on review, included a determination of whether National Sugar can recover from the fund produced by the sale of the M/V Constantinos for its four claims. The special master allowed the first claim in full and the second to the extent of $3,784.57, and no party having objected to these findings we affirm them as stated earlier. We now turn, as did the special master, to the question of whether National Sugar can recover in rem a) for amounts paid the M/V Fortune Carrier for demurrage and b) for related expenses.

National Sugar relies on clause 14(e) of its charter party with Saint Constantinos to recover these losses. That clause provides:

Vessel shall leave discharging berth as soon as possible after completing discharge of cargo, weather and tide permitting, failing which Owner shall indemnify and hold Charterer and Receiver harmless against any resulting loss or damage.[9]

As the special master observed, "[s]imply phrased, the question is: does charter party provision 14(e) entitle National Sugar to recover for damages resulting from the delay in discharging the M/V Fortune Carrier?" (p. 41). The special master concluded that National Sugar's claim should be denied because 1) National Sugar failed to mitigate its damages by acting sooner to move the M/V Constantinos so that National Sugar could use the discharging berth and 2) a party's right to recover for economic loss without physical damage is unclear. We reach the same conclusion although via a somewhat different route.

■■■■ Federal maritime law, not state law, governs the interpretation of an indemnity clause as part of a charter party or other maritime contract. *Corbitt v. Diamond M. Drilling Co.*, 5 Cir. 1981, 654 F.2d 329; *Navieros Oceanikos, S.A. v. S.T. Mobil Trader*, 2 Cir. 1977, 554 F.2d 43, 47; Gilmore and Black, *The Law of Admiralty, supra* at 196. Although, as the special mas-

ter points out, the charter containing clause 14(e) "was not a document carefully drafted by the parties" but rather "is a commonly acceptable form," (p. 49), clause 14(e) apparently has not previously been the subject of much litigation. The parties have not provided us with, nor have we found, any cases interpreting it. The Fifth Circuit has, however, recently articulated as part of maritime law some basic guidelines for interpreting a maritime indemnity contract. It said:

A contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage.

*Corbitt v. Diamond M. Drilling Co., supra* at 333.

■■■■ With those principles in mind, we turn to clause 14(e). In essence, National Sugar claims that clause 14(e) of the M/V Constantinos charter protects it from loss it suffered pursuant to the M/V Fortune Carrier charter. We disagree. Clause 14(e) of the M/V Constantinos charter explicitly protects National Sugar as the "Charterer" of the M/V Constantinos. It commits Saint Constantinos to indemnify and hold harmless National Sugar for any loss or damage which National Sugar suffers in that capacity because the vessel fails to leave the discharging berth promptly. The loss National Sugar seeks to recoup through clause 14(e)—for damage paid to the M/V Fortune Carrier—is not expressly within the terms of the M/V Constantinos charter, nor is it "of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage", as *Corbitt* requires.

---

9. In this clause, references to "Owner" are to Saint Constantinos, which, as bareboat charter-

er, had that status. "Charterer" refers to National Sugar, the voyage charterer.

It was, as National Sugar argues, clearly foreseeable that the late departure of the M/V Constantinos could result in loss to another vessel, or other vessels, and the parties involved with them. It was also foreseeable that some or all of these parties might sue those responsible for the M/V Constantinos, including National Sugar as charterer. The foreseeability of these events is surely the main, and possibly the only, reason for inclusion of clause 14(e) in the charter. Had these events transpired, i.e., had a party which had been injured by the M/V Constantinos' delayed departure sued National Sugar as charterer of the M/V Constantinos, or had National Sugar as charterer of the M/V Constantinos suffered other loss, clause 14(e) would have obligated Saint Constantinos to indemnify and hold harmless National Sugar. But that scenario did not occur here. No party has sought recovery against National Sugar as charterer of the M/V Constantinos. National Sugar has not been damaged in that capacity. The M/V Fortune Carrier sought and received damages from National Sugar as its own charterer, not as the charterer of the arrested vessel. In doing so, the M/V Fortune Carrier relied upon a provision in its own charter, not upon maritime tort law. The M/V Constantinos may have breached a duty to National Sugar as its charterer by not vacating its berth in timely fashion, but since National Sugar as charterer of the M/V Constantinos did not suffer resulting economic loss, the breach is not one which clause 14(e) addresses. Thus, National Sugar cannot assert a lien for breach of the M/V Constantinos charter to recover for demurrage paid on the M/V Fortune Carrier.

National Sugar might, of course, be able to sue the M/V Constantinos in tort for the demurrage paid on the M/V Fortune Carrier, alleging that tortious con-

duct caused it to incur that damage. That claim, even if successful, would not allow National Sugar to assert a maritime lien against the M/V Constantinos. A lien in favor of the charterer attaches to the vessel from the moment performance of a charter commences, *The Oceano*, S.D. N.Y. 1906, 148 F. 131, 133, 2 *Benedict on Admiralty, supra* at § 41, and when a breach of the charter occurs, the lien relates back to that time. *The St. Paul*, S.D. N.Y. 1921, 277 F. 99, 106. Conversely, a tort lien, such as National Sugar would be asserting, would arise only when the M/V Constantinos, by remaining at the berth too long, deprived the M/V Fortune Carrier of a facility at which to discharge its cargo. Thus, National Sugar's lien could have arisen, at the earliest, on April 22, 1979, the day on which the M/V Fortune Carrier arrived in Charlestown and gave notice of its readiness to discharge. The M/V Constantinos, having been arrested two days earlier, was in the Marshal's custody. Under general maritime law and under the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(2)(g), which the Saint Constantinos-National Sugar charter incorporated by reference, a lien may not arise against a vessel in custody of the law. *The St. Paul, supra;* cf. *Payne v. SS Tropic Breeze, supra* at 239 (expenditures while a ship is *in custodia legis* do not give rise to liens); 2 *Benedict on Admiralty, supra* at § 46. Accordingly, no tort lien against the M/V Constantinos could arise for demurrage National Sugar paid the M/V Fortune Carrier. National Sugar, accordingly, would be precluded from recovery against the vessel and would be restricted to the *in personam* action against Saint Constantinos for which the arbitrator awarded, and we have confirmed, the full relief sought.[10]

We also conclude that National Sugar lacks a maritime lien on an alternate

---

10. This result is not inconsistent with the reasoning of Judge Keeton's "Memorandum" of June 1, 1979 in *National Sugar Refining Co. v. M/V Constantinos et al.*, Civ. Action No. 79–926 ·K, issued before that case was consolidated with the case previously filed and assigned to this session. In that "Memorandum" Judge Keeton denied a motion for partial summary

judgment against National Sugar which would have dismissed its demurrage claim. The briefs did not present him with the construction that we have given the charter. He ruled, as do we, that a lien for breach of charter exists when performance of the charter commences. "Thus, the lien asserted in the present case, if proof at trial supports it, existed before the

ground which is wholly independent of the construction of clause 14(e) just urged. Even assuming that National Sugar could have brought an *in rem* action under clause 14(e) to recover demurrage paid the M/V Fortune Carrier, we join the special master in concluding that it forfeited that lien by failing to mitigate its damages.

First, we must consider whether National Sugar, as a matter of law, could recover under the indemnity contract even if it failed to mitigate. National Sugar has argued that clause 14(e) promises coverage "against any resulting loss or damage." National Sugar therefore contends that the clause promises indemnification even if National Sugar negligently failed to mitigate its damages. In pressing this argument, National Sugar relies principally on two recent First Circuit decisions for the proposition that the indemnitor's concurrent negligence does not deprive it of the benefits of an indemnity agreement covering "any" or "all" loss. *Bosse v. Litton Unit Handling System, Inc.*, 1 Cir. 1981, 646 F.2d 689; *Garbincius v. Boston Edison Co.*, 1 Cir. 1980, 621 F.2d 1171. Those cases are not controlling here. They were diversity cases in which the federal courts were construing and applying state law.[11] It is clear, however, that federal maritime law governs the interpretation of an indemnity clause in a maritime contract. *Corbitt v. Diamond M. Drilling Co., supra* at 332. And under maritime law, "it is widely held that a contract of indemnity will not afford protection to an indemnitee against the consequences of his own negligent act unless the contract clearly expresses such an obligation in un-

equivocal terms." *Corbitt v. Diamond M. Drilling Co., supra* at 333; see *Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge*, 5 Cir. 1970, 424 F.2d 684, 692, cert. denied 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64. That principle applies equally when the damage results solely from the actions of the indemnitee and when "the concurring negligence of the indemnitee and indemnitor causes the damage." *Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge, supra* at 692. Although clause 14(e) is broadly phrased, it does not relieve a party of its duty to mitigate damages nor does it clearly cover the negligent failure of a party to do so.

The special master found that National Sugar could have avoided its demurrage and related loss but failed to do so. Essentially, he found that National Sugar or its agents knew on April 19, 1979 that the M/V Constantinos, whose cargo had already been discharged, was likely to be arrested at its berth, that National Sugar could have acted to move the vessel before its demurrage began, but that it failed to participate actively in those efforts until May 7.[12] We, too, conclude that National Sugar, by resting inactive for two and one-half weeks rather than acting to avoid a problem it in some part caused, negligently failed to mitigate its damages and accordingly, removed itself from the protection of clause 14(e).

## VI. Summary

Our rulings on the various objections require minor revisions in the distribution recommended by the special master at page 58

---

vessel came into the custody of the law." Based on further proceedings, we conclude, in part, that the demurrage damages which followed from the breach of the M/V Constantinos charter were not the type the charter covered. Thus, National Sugar lacks a lien for breach of charter.

11. We note further that the First Circuit's opinion in *Bosse*, a case involving New Hampshire law, issued after the New Hampshire court had rejected, in *Commercial Union Assurance Co. v. Brown Co.*, 1980, 120 N.H. 620, 419 A.2d 1111, 1113, the rule that indemnity contracts must be construed strictly. See *Bosse v. Litton Unit Handling Systems, supra* at 693. That rule has recently been affirmed as part of mari-

time law. See *Corbitt v. Diamond M. Drilling Co., supra* at 332. Further, the First Circuit noted that the indemnitor was in the best position to avoid the loss; here we find, as did the special master, that National Sugar, the indemnitee, was the party that could have prevented the loss. The indemnitee in *Garbincius*, a case under Massachusetts law, was only vicariously negligent; National Sugar was directly involved.

12. We find these facts and the other summation of facts on pages 40–47 of the special master's report, not "clearly erroneous" and incorporate them by reference.

of his report. On review, we have allowed as liens the claims a) of deceased crew member Bossina for $1,273.88, b) of the crewmembers who signed the invalid releases for an unspecified amount, and c) of Captain Herrera for an unspecified amount. We conclude that Bossina and the other crew members have seamen's wage liens of equal stature to that of crewmember Espinosa. We also conclude that Captain Herrera has a contract lien. Contract and service liens from the same voyage have equal priority and share *pro rata*, with the voyages being arranged in inverse chronological order. *Rayon Y Celanese Peruana, S.A. v. M/V PHGH*, S.D.Ala. 1979, 471 F.Supp. 1363, 1372; *Ramsay Scarlett & Co., Inc. v. S.S. Koh Eun*, E.D.Va., 1978, 462 F.Supp. 277, 288; 2 *Benedict on Admiralty, supra* at § 51. After having determined the amount of Captain Herrera's contract lien, the special master should determine how much of that amount is identified with each voyage so that the priority of Captain Herrera's contract lien relative to the various liens for supplies and services can be established. We also conclude that Bossina and the crew should receive prejudgment interest on their liens of 10% for the reasons stated on page 58 of the special master's report. Captain Herrera should receive that rate to the extent his lien relates to the last voyage. As stated earlier, we adopt the special master's recommendation that prejudgment interest of 10% be awarded to Port Terminals, Espinosa and National Sugar but not to other claimants. The priorities of the claim *in custodia legis* and the liens, subject to the further report of the special master as specified above, now stand:

| | | plus interest from |
|---|---|---|
| Port Terminals | 5,400.00 | May 16, 1979 |
| Espinosa | 5,991.47 | Apr. 20, 1979 |
| Bossina | 1,273.88 | " " " |
| Crew | ? | " " " |
| National Sugar Cargo Damage | 24,093.77 | " " " |
| National Sugar Breach of Charter | 3,784.57 | " " " |
| ? Herrera Contract | ? | " " " |
| Gulf Water Materialmen – class 2 | 4,199.62 | |
| ? Herrera Contract | ? | |
| Dixie Materialmen – class 3 | 887.00 | |

| | |
|---|---|
| All Ships Materialmen – class 3 | 10,728.28 |
| Atlantic & Gulf Materialmen – class 3 | 1,667.61 |
| ? Herrera Contract | ? |
| All Ships Materialmen – class 4 | 1,261.22 |
| Weber Materialmen – class 4 | 1,298.60 |
| Strachan Materialmen – class 5 | 29,048.84 |
| New Star Materialmen – class 5 | 8,461.48 |
| Boland Materialmen – class 5 | 44,830.00 |
| Hellas Materialmen – class 5 | 16,415.65 |

## VII. Order of Recommittal

The court recommits the following issues to the special master: 1) the amount, if any, of the release-signing crew members' wage liens up to April 20, 1979 (after having subtracted amounts received); 2) the amount of Captain Herrera's contract lien; 3) the relative priority/priorities of Captain Herrera's contract lien. The special master shall make these findings based on the record as it now exists. He shall report those findings to the court pursuant to Rule 53(e)(1), Fed.R.Civ.P., by April 2, 1982, at which time he shall also submit a supplementary statement for his services. Parties may object to any of these findings as provided in Fed.R.Civ.P. 53(e)(2). The court will then issue and enter an order for final judgment which will be consistent with this memorandum of decision and which will dispose of these remaining issues.