**UNITED STATES of America**

v.

**ONE (1) DEFENDER LOBSTER VESSEL NAMED BETTY II,** etc., et al., Defendant.

**No. 83–0904 CIV LCN.**

United States District Court, S.D. Florida, S.D.

June 25, 1984.

Barry Seltzer, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Rudolph Browd, Miami, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NESBITT, District Judge.

THIS CAUSE came before this Court for a non-jury trial on June 13 and 14, 1984. The Plaintiff, UNITED STATES OF AMERICA, seeks civil forfeiture of the Defendant vessel, One (1) Defender Lobster Vessel Named, BETTY II, pursuant to 21 U.S.C. § 881, 49 U.S.C. § 781, 19 U.S.C. §§ 1595a(a) and 1703.

The Court, having heard the testimony of the witnesses, having considered the evidence and having made determinations of credibility of the witnesses presented, enters the following findings of fact and conclusions of law.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

The Plaintiff, UNITED STATES OF AMERICA, filed an Amended Complaint for Forfeiture in Rem, alleging that on February 9, 1983, officers of the U.S. Customs Service seized the Defendant motor vessel; that said motor vessel was used or was intended to be used to transport or to facilitate the transportation, receipt, possession or concealment of marijuana into the United States; that a secret compartment for the purpose of smuggling was built into the defendant vessel.

The claimant, Gonzalez Fundora Fishing, Inc., filed its Answer to the Amended Complaint, alleging an interest in the defendant vessel as its lawful owner. The claimant denied any knowledge of the defendant vessel's alleged illegal activities and denied that a secret compartment had been built into the vessel.

## FINDINGS OF FACT

1) On February 7 or 8, 1983, Customs Agent Thomas Arnold received a telephone call from a documented confidential informant who advised him that a lobster vessel by the name of the Betty II had just brought a load of marijuana into the United States and was currently docked behind a home at the end of Coco Plum in Marathon, Florida. Marathon, located in the Florida Keys, offers ready access to the open seas. The informant, who was not paid for the information and whose information had proved accurate six times previously, told Agent Arnold that the vessel might still be loaded with marijuana and that it contained a false compartment located underneath the stove.

2) Agent Arnold contacted Customs Patrol Officer (CPO) Kenneth Cooper and relayed to him the information he had received from the informant. Officer Cooper, along with CPO Marshall Leon Harris, went to the Coco Plum property on February 9, 1983. They were met by an elderly man, Castor Garcia. Officer Cooper identified himself to Garcia and asked him if he was in charge of the property. He responded that he was taking care of the property for his daughter and maintaining the vessel for a friend of his from Miami, whose name he could not recall. Officer Cooper asked Garcia for his permission to board the vessel; Garcia consented.

3) Officers Cooper and Harris boarded the Betty II and proceeded to the cabin window. From that vantage point, the officers observed a different shade of painted

fiberglass protruding from underneath stove.

4) The officers entered the cabin, pulled the stove away from the wall and found a five (5) foot gas hose connecting the stove to a propane gas tank. The officers tapped on the fiberglass under the stove and a rectangular hatch fell into a below-deck secret compartment. Officers Cooper and Harris descended into the compartment using a ladder affixed to the bulkhead wall.

5) Inside the secret compartment, the Customs officers observed marijuana residue scattered on the floor and embedded in the foam covered outer walls. They collected 12 to 15 grams. Officer Cooper administered a standard chemical field test to the suspected substances. The field test proved positive for marijuana.

6) Officer Cooper also found a load of spoiled fish in the vessel's ice hold. This vessel had not been equipped with commercial fishing equipment. The presence of the spoiled fish suggested to him that the fish had been purchased, not caught, a common ploy of narcotics smugglers to appease the Coast Guard in the event of an investigatory stop.

7) Officers Cooper and Harris informed Garcia that the vessel was being placed under seizure by the United States Customs Service. They then contacted their sector office in Miami to report the seizure, as well as the Coral Bay Marina in Islamorada to arrange for storage. Charles Thomson, an employee of the marina, captained the boat from the Marathon seizure location to the Islamorada storage marina.

8) Customs Agent Thomas Arnold was tendered and accepted as an expert in the location, detection, and appearance of false or secret compartments. Agent Arnold is an instructor on this subject at Coast Guard training sessions. He testified that in his opinion the vessel had been fitted out with a false or secret compartment. In support of his opinion, Agent Arnold referred to the unusual location of the compartment opening, underneath the stove, to the multiple fiberglass layers covering the hatch, to the odor-proof foam on the outer walls of the compartment, and to the five (5) foot length of the stove gas pipe, allowing for easy movement of the appliance. Agent Arnold's testimony was highly credible.

9) Charles Thomson, an expert in boat construction, testified that it was unlikely that the Betty II had been constructed for commercial fishing. Thomson produced schematic drawings of the vessel that were placed into evidence. He had calculated the size of the ice hold and the fuel tanks and testified that the ice hold was extremely small relative to the extraordinarily large fuel tanks. Mr. Thomson calculated that the fuel capacity of this vessel allowed for a range of 1700 miles, a sufficient range to reach Columbia. Mr. Thomson also testified that a guiding principle in boat construction is to make use of all available space. He stated that it simply is not logical to construct an ice hold in an area that denies access to a large compartment, as had occurred in the construction of the Betty II. He testified that the only sensible approach would have been to build the ice hold further aft, thereby permitting the remaining space to be used for additional storage or berthing quarters.

10) Claimant presented the live testimony of one witness, its president, Rene Gonzalez. Gonzalez testified that it was he who primarily financed the purchase of the hull. He acknowledged, however, that the bill of sale was made out to two other individuals, Ignacio Gonzalez and Fernando Fundora, rather than to himself or to the boat's registrant, the claimant corporation.

11) Rene Gonzalez testified that the inside of the hull was constructed by Ignacio Gonzalez and Fernando Fundora and, again, financed largely by himself. He acknowledged having familiarity with Ignacio Gonzalez's criminal narcotics conviction at the time of construction. Although he claimed that the vessel had not been fitted out with a secret compartment, he proffered no credible explanation for the wasted compartment space below deck, for the lengthy size of the gas hose, for the location of the insulating foam on the outside

compartment wall, opposite the ice hold, for the absence of commercial fishing equipment, or for the extraordinarily large fuel tanks. Gonzalez testified that the compartment had been foamed before a newer, smaller ice hold was built, but he was unable to reconcile that testimony with a photograph showing foam on the bottom of the ice hold wall.

12) Rene Gonzalez testified that he had leased the Betty II in early January 1983 to an individual by the name of Regino Padron, a man known to him for a few months as a fisherman. Gonzalez could not recall the names of those who had supplied the references for Padron. He never personally, nor through an agent, verified Padron's address or investigated his background. He did not know whether Padron was a citizen. Gonzalez admitted that the lease agreement had never been reduced to writing and that his lessee was relative stranger.

13) Claimant introduced into evidence the deposition testimony of Castor Garcia.

## CONCLUSIONS OF LAW

1. Probable cause is defined as a reasonable ground for belief of guilt supported by less than prima facie proof but more than mere suspicion. *United States v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir.1980), *United States v. One 1975 Ford F100 Pick-up Truck*, 558 F.2d 755, 756 (5th Cir.1977). *United States v. One 1971 Chevrolet Corvette Automobile*, 496 F.2d 210, 212 (5th Cir.1974).

■ 2. When the defendant vessel, the Betty II, was seized by U.S. Customs Patrol Officers Cooper and Harris in Marathon on February 9, 1983, approximately 12–15 grams of marijuana were located in a secret compartment below the deck of the vessel. The defendant vessel facilitated the receipt, possession and concealment of a controlled substance and contraband article in violation of 19 U.S.C. § 1595a, 21 U.S.C. § 881, and 49 U.S.C. § 781. The Court therefore concludes that the United States of America met its burden of establishing probable cause for the seizure of

the Betty II and the institution of this forfeiture action.

■ 3. Once the government established probable cause, the burden of proof shifted to the claimant to prove a defense to the forfeiture. 19 U.S.C. § 1615 (1980); *United States v. One 1975 Ford F100 Pick-up Truck*, 558 F.2d 755, 756 (5th Cir. 1977), *United States v. One 1971 Chevrolet Corvette Automobile*, 496 F.2d 210, 212 (5th Cir.1974). The claimant must prove a defense by a preponderance of the evidence. *Ford F100 Pickup Truck*, 558 F.2d at 756.

■ 4. "Innocence [of the claimant], in and of itself, is an insufficient defense to forfeiture," *United States v. One 1957 Rockwell Aero Commander 680 Aircraft*, 671 F.2d 414, 417 (10th Cir.1982). To prevail on the defense of innocence, a claimant must establish that 1) he was not involved in the wrongful activity, 2) he was not aware of the wrongful activity, and 3) he had done all that reasonably could be expected to prevent the proscribed use of his property. *United States v. One (1) 1980 Stapleton Pleasure Vessel Named Threesome Registration No. FL4180EA*, 575 F.Supp. 473, 478 (S.D.Fla.1983), citing *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 689, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452 (1974).

■ 5. The Court concludes that claimant failed to establish the defense of innocence by a preponderance of the evidence. The company's president, Rene Gonzalez, did not do all that reasonably could have been expected to prevent the proscribed use of its property. He did not reduce his lease agreement to writing. He never checked or verified the lessee's address or his citizenship. He never inquired of local law enforcement agencies about him. He could not recall the names of those who recommended the lessee. By the admissions of Gonzalez, the lessee was a relative stranger.

6. The Court concludes that claimant corporation constructed this vessel to

smuggle merchandise into the United States in violation of 19 U.S.C. § 1703, as evidenced by the presence of a false or secret compartment. A false or secret compartment is a prospective storage area that is not apparent to the average user of a conveyance and serves no legitimate function. The unusual location of the compartment opening underneath the stove, the five (5) foot gas hose behind the stove allowing for easy movement of the appliance, the multiple layers of fiberglass on the hatch, the odor-proof foam on the below-deck compartment's outer walls, opposite the ice hold, and the location of the ice hold in an area of the vessel creating a large amount of useless and inaccessible space are all probative of a false or secret compartment. In addition, marijuana residue was found in the false or secret compartment of the vessel.

7. The Court concludes that the "Betty II" was not constructed primarily for commercial fishing purposes as evidenced by the absence of commercial fishing equipment, the small size of the ice hold, and the extraordinarily large capacity of the fuel tanks.

8. Customs officials, without a warrant or any suspicion of wrongdoing, may, pursuant to 19 U.S.C. § 1581(a), board and search a vessel having access to the open seas. *United States v. Villamonte-Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). The statute may be relied upon even where there is no intent to inspect the vessel's documents. The Court concludes that under the circumstances of this case a warrantless, suspicionless search of the Betty II would have been lawful, as the vessel had access to the open seas.

9. Where a vessel is on inland waters, 19 U.S.C. § 1581(a) permits a warrantless boarding and search on facts which justify a "reasonable suspicion." *United States v. Kent*, 691 F.2d 1376 (11th Cir.1982), *cert. denied*, 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983). A tip from a known, proven informant can justify a reasonable suspicion of criminal activity. *Id.*, at 1379. The Court concludes that even if reasonable suspicion were required, the tip of the confidential informant would have supplied it.

10. Neither a warrant nor exigent circumstances are necessary to justify a search where there exists probable cause to believe that a crime is occurring. *United States v. Andreu*, 715 F.2d 1497, 1500 (11th Cir.1983). Probable cause exists if "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Elsoffer*, 671 F.2d 1294, 1298 (11th Cir.1982). Even if probable cause were required under these circumstances to board and search the Betty II, the Court concludes that the information given the Customs officials here constituted much more than reasonable suspicion; it easily rose to the level of probable cause.

11. Even if the Customs officials had not had probable cause to search the cabin prior to boarding, the Court concludes that probable cause existed once the officers, who were already lawfully on the deck of the vessel, observed from the cabin window the different shaded fiberglass. The observation verified the tip provided by the confidential informant and provided probable cause to believe the vessel contained a false compartment beneath the stove.

12. Even if exigent circumstances were required for a warrantless search, they were present in this cause by virtue of the fact that a vessel is an inherently mobile conveyance. *United States v. D'Antignac*, 628 F.2d 428, 434 (5th Cir.1980).

13. Alternatively, the warrantless boarding and search of the Betty II was constitutional because it was conducted pursuant to consent, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), granted by Castor Gar-

cia, an individual who had apparent authority to issue such consent. *United States v. Carter,* 569 F.2d 801, 804 (4th Cir.1977), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978).

It is the conclusion of the Court that the defendant lobster vessel BETTY II shall be and is hereby deemed forfeit to the United States of America for violation of 19 U.S.C. § 1595a, 21 U.S.C. § 881, 49 U.S.C. § 781, and 19 U.S.C. § 1703.