Hector F. RAMIREZ, Wilfredo Riquete Molina, Benjamin Puche–Daza, Jesus Chancone–Andrade, Andres Ruiz Gonzalez, Jose Vergara Galvis, Anton Montan, and Jose Martinez–Rodriguez, Plaintiffs,

and

Asociacion de Morinos Professionales and Delta of St. Petersburg, Inc., Intervening Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 88–784–Civ–T–10C.

United States District Court, M.D. Florida, Tampa Division.

May 17, 1991.

J. Michael Shea, Tampa, Fla., for plaintiff.

Warren Zimmerman, Asst. U.S. Atty., Tampa, Fla., Damon C. Miller, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

JAMES HARVEY, District Judge.

This case stems from the seizure by United States Customs agents of a vessel used for importing cocaine into the United States. Plaintiffs, the master and crew of the seized vessel, seek maritime liens for wages. In their first amended complaint, they ask the Court to set aside the United States Customs Service's denial of their wage claims, and to enter a judgment awarding them maritime liens. Intervening plaintiffs allege that they performed services on behalf of the vessel. They also seek maritime liens for their services.

The Court tried this case without a jury on March 6, 1991. After considering the pleadings, the testimony of the witnesses, the documents in evidence, and the arguments of the parties, the Court makes the following findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52.

### I. FINDINGS OF FACT[1]

1. On May 3, 1988, United States Customs agents (Customs agents) seized an oceangoing vessel, the M/V Amazon Sky, under 21 U.S.C. § 881, because it was used to import cocaine into the United States.

2. Plaintiff Anton Montan (Captain Montan) served as Master of the M/V Amazon Sky.

3. Plaintiff Hector F. Ramirez served as Chief Officer on the vessel.

4. The remaining plaintiffs, excluding the intervening plaintiffs (hereinafter intervening plaintiffs), served as crew members on the vessel.

5. Customs agents removed plaintiffs from the vessel when they seized it, and prevented plaintiffs from removing anything other than their personal belongings.

6. Plaintiffs did not know that the M/V Amazon Sky carried cocaine. Accordingly, the United States never charged plaintiffs with any crime.

---

1. If any finding of fact is determined to be a conclusion of law, it shall be so treated, notwithstanding its inclusion here as a finding of fact.

7. Among his other responsibilities as Master of the M/V Amazon Sky, Captain Montan served as paymaster.

8. Soon after Customs agents forced plaintiffs to leave the vessel, Captain Montan prepared an accurate summary of amounts owed to himself and his crew by Barellan International, Ltd. (Barellan), the vessel's owner. The following summary reflects amounts owed to each plaintiff:

| | |
|---|---|
| Hector F. Ramirez | $15,000.00 |
| Wilfredo Riquete Molina | $11,832.00 |
| Benjamin Puche–Daza | $ 3,186.67 |
| Jesus Chancone–Andrade | $16,200.00 |
| Andres Ruiz Gonzalez | $ 3,871.33 |
| Jose Vergara Galvis | $ 8,160.00 |
| Anton Montan | $24,614.00 |
| Jose Martinez–Rodriguez | $ 3,903.00 |
| Total | $86,767.00 |

9. Both Captain Montan and Ramirez had entered written, one-year employment contracts, although these one-page form contracts did not include all of the terms of the agreements between the men and Barellan.

10. Each of the remaining crew members had entered oral, one-year employment contracts.

11. At the time plaintiffs entered their agreements with Barellan, a custom prevailed among the owners of vessels in the Caribbean and their employees that for every twelve months an employee worked aboard a vessel, the employee would receive one month of vacation pay.

12. The agreements entered by Captain Montan and Ramirez included the custom that for every twelve months worked they would receive one month of vacation pay, even though the written employment contracts do not reflect this term. *See* Conclusion of Law 20.

13. The oral agreements entered by the remaining crew members also included the custom that for every twelve months worked they would receive one month of vacation pay.

14. At the time plaintiffs entered their agreements with Barellan, another custom prevailed among the owners of vessels in the Caribbean and their employees that once a vessel took on an employee, the owner agreed to pay the employee for twelve months of work, plus one month of vacation, even if the vessel did not require the employee's services for the entire year. The employee lost the right to collect full wages if the captain discharged the employee for poor work performance, if the captain became dissatisfied with the employee's conduct, or if the employee asked to leave the vessel before the end of the twelve-month period.

15. The written agreements entered by Captain Montan and Ramirez reflect, in part, the custom outlined in Finding of Fact 14. Paragraph 6 of both written contracts reads as follows:

> Also it is agreed that if the Master of the vessel is not satisfied whit [sic] the seamans [sic] conduct on board or his ability or performance of his duties, he shall have the right to repatriate the seaman without any compensation or any other payment except his worked salary....

16. Even though the written employment contracts entered by Captain Montan and Ramirez do not reflect in its entirety the custom outlined in Finding of Fact 14, the agreements included that custom. *See* Conclusion of Law 20.

17. The oral agreements entered by the remaining crew members also included the custom outlined in Finding of Fact 14.

18. Captain Montan's summary of wages owed, which is detailed in Finding of Fact 8, includes vacation pay owed, wages for work performed aboard the vessel, and wages to which the crew became entitled under the terms of their contracts when the vessel no longer required their services. In addition, with regard to Captain Montan, the summary reflects $114.00 in out-of-pocket expenditures made on behalf of the vessel.

19. United States Customs Service (the Customs Service) records showed that Barellan owned the M/V Amazon Sky. Thus, on May 10, 1988, the Customs Service sent a letter to Barellan, advising that the Customs Service had seized the M/V Amazon Sky. The letter also described the proce-

dures available if Barellan wished to petition for relief from the forfeiture.

20. The Customs Service did not send plaintiffs letters advising them of available procedures.

21. Beginning May 16, 1988, the United States Customs Service published in the *Tampa Tribune* for three consecutive weeks a notice that it had seized the M/V Amazon Sky and that it intended to sell the vessel.

22. On May 27, 1988, plaintiffs' counsel, J. Michael Shea, mailed to the Customs Service a letter stating that he represented plaintiffs, and that plaintiffs claimed an interest in the M/V Amazon Sky. Shea advised the Customs Service that plaintiffs sought a maritime lien for wages owed. Shea also noted in his letter that section 608 of the Tariff Act of 1930, as amended, requires any claimant with an interest in a seized vessel to file a claim and a bond with the appropriate customs officer within twenty days from the date of the first publication of the notice of seizure. *See* 19 U.S.C. § 1608. He asked the Customs Service to waive the bond requirement because plaintiffs were indigent. Finally, he stated that he understood that the Customs Service would refer his clients' claims to the United States attorney, and that judicial forfeiture proceedings would soon begin.

23. Plaintiffs filed this lawsuit seeking a maritime lien for wages on June 2, 1988.

24. On June 6, 1988, the Customs Service declared the M/V Amazon Sky forfeited.

25. On July 7, 1988, Delta of St. Petersburg (Delta) filed a motion to intervene under Rule 24(a) of the Federal Rules of Civil Procedure. Delta alleged in its motion that it had unloaded cargo from the M/V Amazon Sky, and that the vessel's owner had not yet paid for those services.

26. Also on July 7, 1988, Asociacion de Morinos (Asociacion) filed a motion to intervene under Rule 24(a) of the Federal Rules of Civil Procedure. Asociacion alleged in its motion that it had advanced money to a former crew member, and that the vessel's

owner had agreed to reimburse Asociacion, but had failed to do so.

27. Because he had not heard from the Customs Service by August 24, 1988 regarding plaintiffs' claims, Shea directed Karen Pixton, a paralegal he employed, to call the Customs Service. On August 24, 1988, Pixton called the Customs Service and spoke with Virginia Walls, a clerk/typist employed by the Customs Service. Walls advised Pixton that the Customs Service had received Shea's May 27, 1988 letter.

28. Shea wrote to Damon Miller, defendant's counsel, on September 26, 1988. Shea noted in his letter that neither he nor his clients had yet received notice of impending forfeiture proceedings.

29. On October 14, 1988, Shea wrote to Richard Freedland, Assistant Regional Counsel for the Customs Service. In his letter, Shea stated that he had learned that the Customs Service planned to sell the M/V Amazon Sky in a summary administrative forfeiture sale. He questioned whether the Customs Service could lawfully do so in light of his clients' claims; yet, he indicated that he might not object to such a sale if the Customs Service would agree to pay his clients' claims out of the proceeds of the administrative sale.

30. The Customs Service sold the M/V Amazon Sky for $440,000 at a public auction on December 14, 1988.

31. Shea again wrote to Freedland on February 9, 1989. In his letter, Shea renewed his clients' wage claims.

32. On February 15, 1989, the Court granted the motions to intervene filed by Delta and Asociacion.

33. On April 27, 1989, Shea sent a letter to the Customs Service in which he detailed plaintiffs' claimed wages. He indicated that Captain Montan had derived the figures from his personal knowledge.

34. On May 18, 1989, Mary Ann Cranford, a Fines, Penalties and Forfeitures Officer at the Customs Service's Tampa office, wrote to Shea. She advised him that he had failed to document adequately his clients' claims. She asked him to send

official payroll records and copies of contracts between plaintiffs and their employer.

35. On December 26, 1989, Dianne A. Zwicker, the District Director of the Customs Service in Tampa, wrote to Shea advising him that the Customs Service had received partial payroll records which the Drug Enforcement Agency (DEA) had seized from the M/V Amazon Sky. She indicated that the Customs Service would soon review plaintiffs' claims.

36. On January 4, 1990, defendant filed a motion to dismiss under Rule 12 of the Federal Rules of Civil Procedure all claims asserted in this case.

37. The Court granted defendant's motion to dismiss on February 13, 1990, although the Court also granted both plaintiffs and intervening plaintiffs "leave to amend within twenty (20) days, failing which this action shall stand and be taken as dismissed without prejudice and without further order."

38. After reviewing the partial payroll records left on the M/V Amazon Sky, the Customs Service determined that only Captain Montan and Ramirez were entitled to share in the proceeds of the sale of the vessel. Moreover, the Customs Service determined that Captain Montan and Ramirez were entitled to much less than they had claimed. In reaching its decision, the Customs Service reviewed only the payroll records forwarded by the DEA.

39. On February 28, 1990, the Customs Service sent Captain Montan a check in the amount of $12,061.48, and sent Ramirez a check in the amount of $3,650.00.

40. After the Court granted plaintiffs' motion to enlarge the twenty-day period which the Court had given them to file an amended complaint, plaintiffs filed their first amended complaint on March 14, 1990.

41. Intervening plaintiffs Delta and Asociacion never filed amended complaints.

**2.** If any conclusion of law is later determined to be a finding of fact, it shall be so characterized, notwithstanding its inclusion here as a conclusion of law.

## II. CONCLUSIONS OF LAW [2]

1. Customs agents seized the M/V Amazon Sky under the Controlled Substances Act of 1970 because it was used to import cocaine into the United States. *See* Finding of Fact 1. Cocaine is a controlled substance under federal drug laws. 21 U.S.C. §§ 802(6), 812(c).

2. The Controlled Substances Act of 1970, as amended, provides that vessels used to transport controlled substances "shall be subject to forfeiture to the United States and no property right shall exist in them...." 21 U.S.C. § 881(a).

3. The Controlled Substances Act of 1970, as amended, provides that the procedures outlined by Congress for the seizure and forfeiture of property under United States customs laws shall apply to property seized under the Controlled Substances Act of 1970. 21 U.S.C. § 881(d).

4. The Tariff Act of 1930, as amended, contains the procedures outlined by Congress for the forfeiture of property seized by the Customs Service. *See* 19 U.S.C. §§ 1602–16. Hence, such procedures govern seizures and forfeitures of property under the Controlled Substances Act of 1970. *See* 21 U.S.C. § 881(d).

5. When the Customs Service seizes a vessel used to import any controlled substance, the Tariff Act of 1930, as amended, requires the appropriate customs officer to publish for at least three consecutive weeks a notice of its intention to sell or otherwise dispose of seized property. 19 U.S.C. § 1607(a)(3). The Customs Service complied with this requirement by publishing notice in the *Tampa Tribune* beginning May 16, 1988. *See* Finding of Fact 21.

6. In addition, section 1607(a)(3) requires the appropriate customs officer to send written notice of the seizure, and information on applicable procedures, to each party who appears to have an interest in the seized property. 19 U.S.C. § 1607(a)(3). The Customs Service complied with this requirement [3] by advising Barellan that it

**3.** The Court notes that plaintiffs do not argue that the Customs Service failed to comply with this requirement because it did not provide them with written notice and information on

had seized the M/V Amazon Sky and that Barellan had to comply with certain procedures to petition for relief from the forfeiture. *See* Finding of Fact 19.

7. The Tariff Act of 1930, as amended, requires any claimant with an interest in a seized vessel to file a claim with the appropriate customs officer. 19 U.S.C. § 1608. Thus, the Court must determine whether plaintiffs hold an interest in the vessel sufficient to give them standing to contest the forfeiture.

8. In *United States v. Five Hundred Thousand Dollars,* 730 F.2d 1437, 1439 (11th Cir.1984), the court held that a "party seeking to challenge the government's forfeiture of ... property used in violation of federal law must first demonstrate an interest in the seized item sufficient to satisfy the court of its standing to contest the forfeiture.... One must claim an ownership or possessory interest in the property seized." (Citations omitted). Each of the plaintiffs argues that he holds a maritime lien for seaman's wages and that the lien is a possessory interest which gives him standing to contest the forfeiture.

■ 9. A seaman's lien for unpaid wages is a common law lien against a vessel. G. Gilmore & C. Black, *The Law of Admiralty,* 544 (1st ed. 1957); *Taylor v. Carryl,* 61 U.S. (20 How.) 583, 15 L.Ed. 1028 (1858) (Taney, J., dissenting) (the seaman's lien for wages is among those "principles of law which have been so long and so well established that it is sufficient to state them without referring to authorities...."); *In re Stone,* 119 B.R. 222, 228 (Bankr.E.D.Wash.1990) (citing *United States v. ZP Chandon,* 889 F.2d 233 (9th Cir.1989)). In *ZP Chandon,* 889 F.2d at 237, the court stated that "[s]eamen's claims for wages are generally deemed 'sa-

cred liens, and, so long as a plank of the ship remains, the sailor is entitled, against all other persons to the proceeds as a security for his wages.'" (Quoting G. Gilmore & C. Black, *The Law of Admiralty,* 627 (2d ed. 1975), citing *The John G. Stevens,* 170 U.S. 113, 119, 18 S.Ct. 544, 547, 42 L.Ed. 969 (1898)). Similarly, in *Thorsteinsson v. M/V Drangur,* 891 F.2d 1547, 1551–52 (11th Cir.1990), the court stated that "American courts have accorded recognition to [seamen's wage liens] ... above all other types of liens." *See also Dunham v. M/V Marine Chemist,* 812 F.2d 212, 214–15 (5th Cir.1987) (recognizing a maritime lien for unpaid seaman's wages under "general maritime law"); *Cf. Medina v. Marvirazon Compania Naviera, S. A.,* 533 F.Supp. 1279, 1283–84 (D.Mass. 1982) (acknowledging maritime lien for unpaid seaman's wages under maritime law, but failing to state source of lien).

■ 10. A maritime lien for an unpaid seaman's wages is a property right in the vessel, arising in favor of the seaman. *See Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 602 (5th Cir.1986). A "maritime lien may be defined as a property right that adheres to the vessel wherever it may go." *Id.* Thus, except for Captain Montan, who is not considered a seaman under maritime law, *Medina,* 533 F.Supp. at 1285–87, each of the plaintiffs hold a common law possessory interest in the M/V Amazon Sky sufficient to give them standing to contest the forfeiture.

■ 11. Although Captain Montan is not entitled to a common law lien for unpaid wages, courts have allowed contract liens to masters of vessels under 46 U.S.C.App. § 971.[4] *E.g., Medina,* 533 F.Supp. at 1286–87. Section 971 provides, in part, that "any person furnishing re-

---

applicable procedures. *See* Finding of Fact 20. Although the Court need not reach this issue in light of its holding, the Customs Service arguably should have given written notice and information on applicable procedures to plaintiffs because evidence introduced at trial indicates that it knew of plaintiffs' interest in the vessel. *See Gutt v. United States,* 641 F.Supp. 603, 605–06 (W.D.Va.1986) (held: United States "plainly cannot rely on publication notice to satisfy the requirements of § 1607 and due process since

[claimant] had indicated he had an interest in [the seized property] and wished to contest any forfeiture").

**4.** Although repealed by Pub.L. 100–710, § 106(b)(2), 102 Stat. 4752 (1988), 46 U.S.C.App. § 971 was in effect at the time the United States seized the M/V Amazon Sky; Congress's repeal took effect on January 1, 1989.

pairs, supplies ... or other necessaries, to any vessel ... upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel." Courts broadly construe the phrase "other necessaries" in section 971. In holding that a master is entitled to a contract lien under section 971, the court in *Medina* stated that "surely a captain's services are necessary." 533 F.Supp. at 1287. Hence, Captain Montan also holds a possessory interest in the M/V Amazon Sky sufficient to give him standing to contest the forfeiture.

■ 12. In addition to the requirement that a claimant must claim an ownership or possessory interest in the property seized, the Tariff Act of 1930, as amended, requires claimants to file their claims within twenty days from the date of the first publication of the notice of seizure. 19 U.S.C. § 1608. Plaintiffs complied with this requirement by mailing to the Customs Service their claims on May 27, 1988, eleven days after the date of first publication of the notice of seizure in the *Tampa Tribune*. *See* Findings of Fact 21 and 22. Evidence introduced at trial showed that the Customs Service received the letter, which plaintiffs' counsel neglected to send by certified mail or other verifiable method. *See* Finding of Fact 27.

■ 13. Section 1608 also requires a claimant to file a bond with the appropriate customs officer within twenty days from the date of the first publication of the notice of seizure. 19 U.S.C. § 1608. Although plaintiffs did not file a bond with the Customs Service as required by section 1608, they asked the Customs Service in their May 27, 1988 letter to waive the bond requirement because of their indigency. *See* Findings of Fact 22 and 27. In light of the Customs Service's failure to respond to plaintiffs' request, the Court holds that

plaintiffs' waiver request satisfies the bond requirement.

■ 14. Furthermore, section 1608 requires the appropriate customs officer to "transmit such claim and bond ... to the United States attorney for the district in which seizure was made, who shall proceed to a condemnation of the merchandise or other property in the manner prescribed by law." 19 U.S.C. § 1608. The Customs Service did not comply with this requirement. The Customs Service knew that plaintiffs sought judicial forfeiture proceedings, rather than summary administrative forfeiture proceedings, because plaintiffs had properly filed their claim, *see* Findings of Fact 22 and 27, and because they had also filed this lawsuit, *see* Finding of Fact 23; *see also* Findings of Fact 28 and 29. Yet, the Customs Service ignored plaintiffs' claims and began administrative forfeiture proceedings.[5] On June 6, 1988, the Customs Service declared the M/V Amazon Sky forfeited,[6] *see* Finding of Fact 24, and on December 14, 1988, it sold the vessel, *see* Finding of Fact 30.

■ 15. Where the government fails to follow the procedures outlined in the Tariff Act of 1930, the proper remedy is to set aside the administrative forfeiture. *Winters v. Working*, 510 F.Supp. 14, 17 (W.D.Tex.1980) (administrative forfeiture proceedings declared void, and judicial forfeiture proceedings held, where government failed to give claimant sufficient notice of the forfeiture procedures as required by section 1607); *Gutt v. United States*, 641 F.Supp. 603, 606 (W.D.Va.1986) (administrative forfeiture proceedings vacated, and government allowed to begin new forfeiture proceedings, where government failed to follow procedures mandated by the Tariff Act of 1930). Hence, the Court will set aside the administrative forfeiture and will treat its March 6, 1991

---

**5.** When no one files a claim within the twenty-day period described in section 1608, section 1609(a) requires the appropriate customs officer to declare the vessel forfeited, to sell it, and to deposit the proceeds into the Customs Forfeiture Fund. 19 U.S.C. § 1609(a).

**6.** When the appropriate customs officer declares a vessel forfeited, "title shall be deemed to vest in the United States free and clear of any liens or encumbrances ... from the date of the act for which forfeiture was incurred." 19 U.S.C. § 1609(b).

bench trial as a judicial forfeiture proceeding.

■ 16. In a judicial forfeiture, the government must first establish probable cause for seizing the vessel and beginning forfeiture proceedings. *United States v. One (1) Defender Lobster Vessel Named Betty II,* 606 F.Supp. 32, 36 (S.D.Fla.1984). Plaintiffs do not dispute that the government had probable cause for seizing the vessel and commencing forfeiture proceedings.

17. Once the government establishes probable cause, the burden shifts to the claimants to prove a defense to the forfeiture by a preponderance of the evidence. *Id.;* 19 U.S.C. § 1615.

■ 18. Plaintiffs argue that the forfeiture should not extinguish their maritime liens because they did not know that the vessel carried cocaine. To prove the defense of innocence, claimants must show that (1) they did not participate in the illegal activity, (2) they did not know of the illegal activity, and (3) they did "all that reasonably could be expected to prevent the proscribed use of [the] property." *One (1) Defender Lobster Vessel Named Betty II,* 606 F.Supp. at 36; *see also United States v. One (1) 254 Ft. Freighter, the M/V Andoria,* 570 F.Supp. 413, 415 (E.D.La.1983) ("The rights of seamen ... and any other claimants are protected ... so long as they had no knowledge of the ... Owner's intention to engage in an illegal venture and did not in any way join in the execution of the violation"). The government does not dispute that plaintiffs neither participated in the illegal activity nor knew of it. *See* Finding of Fact 6. Furthermore, in light of the nature of their possessory interest in the vessel, plaintiffs could not be expected to prevent the vessel's owner from importing cocaine into the United States when they did not even know of the owner's plans. Thus, plaintiffs proved the defense of innocence by a preponderance of the evidence.

■ 19. The Court must now determine the value of plaintiffs' liens. Plaintiffs seek liens equal to amounts owed for wages earned by working aboard the vessel, for future wages, and for vacation pay. *See* Findings of Fact 8, and 12–18. They ask the Court to measure the value of their liens using a breach of contract theory. Defendant contends that the Customs Service properly found that only Captain Montan and Ramirez were entitled to share in the proceeds of the vessel's sale. *See* Findings of Fact 35, 38, and 39.

In *Clark v. The St. Paul,* 77 F. 998 (S.D.N.Y.1897), the court measured seamen's wages using a breach of contract theory. The seamen entered a contract with the ship's owner when they signed shipping articles. Yet, when they arrived at the dock to begin work, they discovered that the ship's engine needed repairs. The seamen were told to report to the dock the next day, but when they did, they were told to report again the following day. On the third day, they learned that the ship would not make the scheduled voyage. The court granted the seamen's claims for wages for the entire voyage, holding that they had partially performed the contract by appearing at the dock for three consecutive days, and that their partial performance entitled them to full wages.

Similarly, in *Slavin v. Port Service Corp.,* 138 F.2d 386 (3rd Cir.1943), the court measured a seaman's lien for wages using a breach of contract theory. The court held that a seaman is entitled to a lien for wages "if he was ready and willing to perform the duties for which he was engaged even though the services were not actually rendered because of the idleness of the vessel." *Id.* at 387; *see also The William Leishear,* 21 F.2d 862, 864 (D.Md. 1927) ("seamen are entitled to a lien for their wages, where, through no fault of their own, they are prevented from earning them aboard the vessel while in navigation").

Thus, plaintiffs are entitled to a lien for wages measured under a breach of contract theory.

■ 20. Captain Montan and Ramirez argue that prevailing customs among owners of vessels in the Caribbean and their employees, both masters and seamen, are included in their agreements with Barellan,

even though the written contracts do not detail the customs. These prevailing customs entitle an employee to one month of vacation pay for every twelve months worked, *see* Finding of Fact 11, and also guarantee that a vessel's owner will pay an employee one year of wages if the employee agrees to work for an entire year, but through no fault of the employee, the ship can not complete its planned voyage, *see* Finding of Fact 14.

In *Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1047 (5th Cir. 1971), the court ruled that evidence of prevailing customs is admissible to show whether a written contract "contains ambiguities or lacks potentially material terms." The court noted that courts may use such evidence to aid in construing a written contract where the parties to the contract failed to reduce their entire agreement to writing. *Id.* at 1047–49. Yet, although courts may use evidence of prevailing customs to construe a written contract, the evidence must not contradict the written agreement. *Id.*

Further, in *Dixon, Iramaos & Cia. Ltda. v. Chase National Bank*, 144 F.2d 759, 762 (2d Cir.), *cert. denied*, 324 U.S. 850, 65 S.Ct. 687, 89 L.Ed. 1410 (1944) (quoting *Hostetter v. Park*, 137 U.S. 30, 40, 11 S.Ct. 1, 4, 34 L.Ed. 568 (1890)), the court noted that "it is ... well settled 'that parties who contract on a subject matter concerning which known usages prevail, incorporate such usages by implication into their agreements, if nothing is said to the contrary.' "

As the Court has found, *see* Finding of Fact 9, the one-page form contracts entered by Captain Montan and Ramirez did not include all of the terms of the agreements between the men and Barellan. In addition, the Court has found that the customs detailed in Findings of Fact 11 and 14 prevailed among the owners of vessels in the Caribbean and their employees. Moreover, these customs do not contradict the written contracts entered by Captain Montan and Ramirez. Indeed, paragraph 6 of both written contracts reflects, in part, the custom outlined in Finding of Fact 14. Paragraph 6 allowed Captain Montan to repatriate any seaman with whom he was not satisfied, "without any compensation or any other payment except his worked salary." The paragraph implies that employees sometimes received compensation exceeding earned wages when they left the vessel.[7] Accordingly, the Court holds that the agreements entered by Captain Montan and Ramirez include prevailing customs which entitle employees to thirteen months pay for twelve months of employment, *see* Finding of Fact 11, and which guarantee an employee one year of wages if the employee agrees to work for a year, but through no fault of the employee, the ship can not complete its planned voyage, *see* Finding of Fact 14. The Court notes that the remaining plaintiffs entered oral agreements which incorporated the prevailing customs. *See* Findings of Fact 13 and 17.

21. Even if the Court assumes that plaintiffs had a duty to mitigate damages, defendant had the burden of proving plaintiffs' failure to mitigate, *see* S. Williston, A Treatise on the Law of Contracts § 1360 (3rd ed. 1968); yet, defendant offered no evidence that plaintiffs did not try to find other employment.

22. The Court holds that each of the plaintiffs are entitled to maritime liens equal to amounts owed for wages earned before the seizure and, because plaintiffs' employment ended through no fault of their own, for wages and vacation pay which the seizure prevented plaintiffs from earning.

23. With regard to intervening plaintiffs Delta and Asociacion, the Court notes that it granted defendant's motion to dismiss on February 13, 1990, although the Court allowed intervening plaintiffs twenty days to amend their complaints. *See* Finding of Fact 37. The Court stated in its order, however, that failure to amend

---

**7.** Arguably, the phrase "*without any compensation or any other payment except his worked salary,*" in paragraph 6, refers solely to paragraph 3 of both agreements. Paragraph 3 states that "[a]fter one year service the seaman can claim a ticket to his homecountry, with 30 days option to the Master if the vessel comes closer to the seamans [sic] homecountry." Yet, in light of the evidence introduced at trial, the Court does not find this interpretation persuasive.

would result without further order in dismissal without prejudice. As intervening plaintiffs failed to amend their complaints, *see* Finding of Fact 41, the Court notes that it deems their claims dismissed without prejudice as of February, 13, 1990.

### III. ORDER

Based on the preceding findings of fact and conclusions of law, the Court finds for plaintiffs. In addition, the Court finds that the claims of intervening plaintiffs Delta and Asociacion were dismissed without prejudice on February 13, 1990. Accordingly, the Court sets aside the administrative forfeiture of the M/V Amazon Sky, and will enter judgment in favor of plaintiffs in the following amounts:

| | |
|---|---|
| Hector F. Ramirez | $11,350.00[8] |
| Wilfredo Riquete Molina | $11,832.00 |
| Benjamin Puche–Daza | $ 3,186.67 |
| Jesus Chancone–Andrade | $16,200.00 |
| Andres Ruiz Gonzalez | $ 3,871.33 |
| Jose Vergara Galvis | $ 8,160.00 |
| Anton Montan | $12,552.52[9] |
| Jose Martinez–Rodriguez | $ 3,903.00 |

SO ORDERED.

8. This amount reflects the total amount due for wages earned aboard the vessel, and for wages and vacation pay which the seizure prevented him from earning, *see* Findings of Fact 8 and 18, minus the amount paid by the Customs Service, *see* Findings of Fact 38 and 39.

9. This amount reflects the total amount due for wages earned aboard the vessel, wages and vacation pay which the seizure prevented him from earning, and expenditures made on behalf of the vessel, *see* Findings of Fact 8 and 18, minus the amount paid by the Customs Service, *see* Findings of Fact 38 and 39.